[L.A. No. 29820. In Bank. Aug. 30, 1971.]

JOHN SERRANO, JR., et al., Plaintiffs and Appellants, v. IVY BAKER PRIEST, as State Treasurer, etc., et al., Defendants and Respondents.

586

**COUNSEL**

David A. Binder, Michael H. Shapiro, William T. Rintala, Harold W. Horowitz and Sidney M. Wolinsky for Plaintiffs and Appellants.

Kenneth Hecht, Peter B. Sandmann, Kathrine Sears, Anne Unverzagt, Louis Garcia, Mario Obledo, Alan Exelrod, Michael Mendelson, Joe Ortega, Stephen D. Sugarman, John E. Coons, David L. Kirp, Mark G. Yudof, Paul R. Dimond, Kenneth F. Phillips, Marc I. Hayutin, A. L. Wirin, Fred Okrand, Laurence R. Sperber, Paul N. Halvonik, Charles C. Marson,

Ephraim Margolin, Irving G. Breyer, Milton Marks, George R. Moscone, Willie Brown, Jr., John Burton, John Francis Foran and Leo T. McCarthy as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, Sanford N. Gruskin and Ernest P. Goodman, Assistant Attorneys General, John D. Maharg, County Counsel, James W. Briggs, Assistant County Counsel, Elaine M. Grillo, Donovan M. Main and DeWitt W. Clinton, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**SULLIVAN, J.**—We are called upon to determine whether the California public school financing system, with its substantial dependence on local property taxes and resultant wide disparities in school revenue, violates the equal protection clause of the Fourteenth Amendment. We have determined that this funding scheme invidiously discriminates against the poor because it makes the quality of a child's education a function of the wealth of his parents and neighbors. Recognizing as we must that the right to an education in our public schools is a fundamental interest which cannot be conditioned on wealth, we can discern no compelling state purpose necessitating the present method of financing. We have concluded, therefore, that such a system cannot withstand constitutional challenge and must fall before the equal protection clause.

Plaintiffs, who are Los Angeles County public school children and their parents, brought this class action for declaratory and injunctive relief against certain state and county officials charged with administering the financing of the California public school system. Plaintiff children claim to represent a class consisting of all public school pupils in California, "except children in that school district, the identity of which is presently unknown, which school district affords the greatest educational opportunity of all school districts within California." Plaintiff parents purport to represent a class of all parents who have children in the school system and who pay real property taxes in the county of their residence.

Defendants are the Treasurer, the Superintendent of Public Instruction, and the Controller of the State of California, as well as the Tax Collector and Treasurer, and the Superintendent of Schools of the County of Los Angeles. The county officials are sued both in their local capacities and as representatives of a class composed of the school superintendent, tax collector and treasurer of each of the other counties in the state.

The complaint sets forth three causes of action. The first cause alleges in

substance as follows: Plaintiff children attend public elementary and secondary schools located in specified school districts in Los Angeles County. This public school system is maintained throughout California by a financing plan or scheme which relies heavily on local property taxes and causes substantial disparities among individual school districts in the amount of revenue available per pupil for the districts' educational programs. Consequently, districts with smaller tax bases are not able to spend as much money per child for education as districts with larger assessed valuations.

It is alleged that "As a direct result of the financing scheme . . . substantial disparities in the quality and extent of availability of educational opportunities exist and are perpetuated among the several school districts of the State. . . . [Par.] The educational opportunities made available to children attending public schools in the Districts, including plaintiff children, are substantially inferior to. the educational opportunities made available to children attending public schools in many other districts of the State. . . ." The financing scheme thus fails to meet the requirements of the equal protection clause of the Fourteenth Amendment of the United States Constitution and the California Constitution in several specified respects.[1]

In the second cause of action, plaintiff parents, after incorporating by reference all the allegations of the first cause, allege that as a direct result of the financing scheme they are required to pay a higher tax rate than tax-

---

[1]The complaint alleges that the financing scheme:

"A. Makes the quality of education for school age children in California, including Plaintiff Children, a function of the wealth of the children's parents and neighbors, as measured by the tax base of the school district in which said children reside, and

"B. Makes the quality of education for school age children in California, including Plaintiff Children, a function of the geographical accident of the school district in which said children reside, and

"C. Fails to take account of any of the variety of educational needs of the several school districts (and of the children therein) of the State of California, and

"D. Provides students living in some school districts of the State with material advantages over students in other school districts in selecting and pursuing their educational goals, and

"E. Fails to provide children of substantially equal age, aptitude, motivation, and ability with substantially equal educational resources, and

"F. Perpetuates marked differences in the quality of educational services, equipment and other facilities which exist among the public school districts of the State as a result of the inequitable apportionment of State resources in past years.

"G. The use of the 'school district' as a unit for the differential allocation of educational funds bears no reasonable relation to the California legislative purpose of providing equal educational opportunity for all school children within the State.

"H. The part of the State financing scheme which permits each school district to retain and expend within that district all of the property tax collected within that district bears no reasonable relation to any educational objective or need.

"I. A disproportionate number of school children who are black children, children with Spanish surnames, children belonging to other minority groups reside in school districts in which a relatively inferior educational opportunity is provided."

payers in many other school districts in order to obtain for their children the same or lesser educational opportunities afforded children in those other districts.

In the third cause of action, after incorporating by reference all the allegations of the first two causes, all plaintiffs allege that an actual controversy has arisen and now exists between the parties as to the validity and constitutionality of the financing scheme under the Fourteenth Amendment of the United States Constitution and under the California Constitution.

Plaintiffs pray for: (1) a declaration that the present financing system is unconstitutional; (2) an order directing defendants to reallocate school funds in order to remedy this invalidity; and (3) an adjudication that the trial court retain jurisdiction of the action so that it may restructure the system if defendants and the state Legislature fail to act within a reasonable time.

All defendants filed general demurrers to the foregoing complaint asserting that none of the three claims stated facts sufficient to constitute a cause of action. The trial court sustained the demurrers with leave to amend. Upon plaintiffs' failure to amend, defendants' motion for dismissal was granted. (Code Civ. Proc., § 581, subd. 3.) An order of dismissal was entered (Code Civ. Proc., § 581d), and this appeal followed.

Preliminarily we observe that in our examination of the instant complaint, we are guided by the long-settled rules for determining its sufficiency against a demurrer. ▇ We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) We also consider matters which may be judicially noticed. (*Id.* at p. 716.) Accordingly, from time to time herein we shall refer to relevant information which has been drawn to our attention either by the parties or by our independent research; in each instance we judicially notice this material since it is contained in publications of state officers or agencies. (*Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 836, fn. 3 [48 Cal.Rptr. 481, 409 P.2d 481]; see Evid. Code, § 452, subd. (c).)

## I

We begin our task by examining the California public school financing system which is the focal point of the complaint's allegations. At the threshold we find a fundamental statistic—over 90 percent of our public school funds derive from two basic sources: (a) local district taxes on real property and (b) aid from the State School Fund.[2]

---

[2]California educational revenues for the fiscal year 1968-1969 came from the following sources: local property taxes, 55.7 percent; state aid, 35.5 percent; federal

By far the major source of school revenue is the local real property tax. Pursuant to article IX, section 6 of the California Constitution, the Legislature has authorized the governing body of each county, and city and county, to levy taxes on the real property within a school district at a rate necessary to meet the district's annual education budget. (Ed. Code, § 20701 et seq.)[3] The amount of revenue which a district can raise in this manner thus depends largely on its tax base—i.e., the assessed valuation of real property within its borders. Tax bases vary widely throughout the state; in 1969-1970, for example, the assessed valuation per unit of average daily attendance of elementary school children[4] ranged from a low of $103 to a peak of $952,156—a ratio of nearly 1 to 10,000. (Legislative Analyst, Public School Finance, Part V, Current Issues in Educational Finance (1971) p. 7.)[5]

The other factor determining local school revenue is the rate of taxation within the district. Although the Legislature has placed ceilings on permissible district tax rates (§ 20751 et seq.), these statutory maxima may be surpassed in a "tax override" election if a majority of the district's voters approve a higher rate. (§ 20803 et seq.) Nearly all districts have voted to override the statutory limits. Thus the locally raised funds which constitute the largest portion of school revenue are primarily a function of the value of the realty within a particular school district, coupled with the willingness of the district's residents to tax themselves for education.

Most of the remaining school revenue comes from the State School Fund pursuant to the "foundation program," through which the state undertakes to supplement local taxes in order to provide a "minimum amount of guaran-

---

funds, 6.1 percent; miscellaneous sources, 2.7 percent. (Legislative Analyst, Public School Finance, Part I, Expenditures for Education (1970) p. 5. Hereafter referred to as Legislative Analyst.)

[3]Hereafter, unless otherwise indicated, all section references are to the Education Code.

[4]Most school aid determinations are based not on total enrollment, but on "average daily attendance" (ADA), a figure computed by adding together the number of students actually present on each school day and dividing that total by the number of days school was taught. (§§ 11252, 11301, 11401.) In practice, ADA approximates 98 percent of total enrollment. (Legislative Analyst, Public School Finance, Part IV, Glossary of Terms Most Often Used in School Finance (1971) p. 2.) When we refer herein to figures on a "per pupil" or "per child" basis, we mean per unit of ADA.

[5]Over the period November 1970 to January 1971 the legislative analyst provided to the Legislature a series of five reports which "deal with the current system of public school finance from kindergarten through the community college and are designed to provide a working knowledge of the system of school finance." (Legislative Analyst, Part I, supra, p. 1.) The series is as follows: Part I, Expenditures for Education; Part II, The State School Fund: Its Derivation and Distribution; Part III, The Foundation Program; Part IV, Glossary of Terms Most Often Used in School Finance; Part V, Current Issues in Educational Finance.

teed support to all districts . . . ." (§ 17300.) With certain minor exceptions,[6] the foundation program ensures that each school district will receive annually, from state or local funds, $355 for each elementary school pupil (§§ 17656, 17660) and $488 for each high school student. (§ 17665.)

The state contribution is supplied in two principal forms. "Basic state aid" consists of a flat grant to each district of $125 per pupil per year, regardless of the relative wealth of the district. (Cal. Const., art. IX, § 6, par. 4; Ed. Code, §§ 17751, 17801.) "Equalization aid" is distributed in inverse proportion to the wealth of the district.

To compute the amount of equalization aid to which a district is entitled, the State Superintendent of Public Instruction first determines how much local property tax revenue would be generated if the district were to levy a hypothetical tax at a rate of $1 on each $100 of assessed valuation in elementary school districts and $.80 per $100 in high school districts.[7] (§ 17702.) To that figure, he adds the $125 per pupil basic aid grant. If the sum of those two amounts is less than the foundation program minimum for that district, the state contributes the difference. (§§ 17901, 17902.) Thus, equalization funds guarantee to the poorer districts a basic minimum revenue, while wealthier districts are ineligible for such assistance.

An additional state program of "supplemental aid" is available to subsidize particularly poor school districts which are willing to make an extra local tax effort. An elementary district with an assessed valuation of $12,500 or less per pupil may obtain up to $125 more for each child if it sets its local tax rate above a certain statutory level. A high school district whose assessed valuation does not exceed $24,500 per pupil is eligible for a supplement of up to $72 per child if its local tax is sufficiently high. (§§ 17920-17926.)[8]

---

[6]Districts which maintain "unnecessary small schools" receive $10 per pupil less in foundation funds. (§ 17655.5 et seq.)

Certain types of school districts are eligible for "bonus" foundation funds. Elementary districts receive an additional $30 for each student in grades 1 through 3; this sum is intended to reduce class size in those grades. (§ 17674.) Unified school districts get an extra $20 per child in foundation support. (§§ 17671-17673.)

[7]This is simply a "computational" tax rate used to measure the relative wealth of the district for equalization purposes. It bears no relation to the tax rate actually set by the district in levying local real property taxes.

[8]Some further equalizing effect occurs through a special areawide foundation program in districts included in reorganization plans which were disapproved at an election. (§ 17680 et seq.) Under this program, the assessed valuation of all the individual districts in an area is pooled, and an actual tax is levied at a rate of $1 per $100 for elementary districts and $.80 for high school districts. The resulting revenue is distributed among the individual districts according to the ratio of each

Although equalization aid and supplemental aid temper the disparities which result from the vast variations in real property assessed valuation, wide differentials remain in the revenue available to individual districts and, consequently, in the level of educational expenditures.[9] For example, in Los Angeles County, where plaintiff children attend school, the Baldwin Park Unified School District expended only $577.49 to educate each of its pupils in 1968-1969; during the same year the Pasadena Unified School District spent $840.19 on every student; and the Beverly Hills Unified School District paid out $1,231.72 per child. (Cal. Dept. of Ed., Cal. Public Schools, Selected Statistics 1968-1969 (1970) Table IV-11, pp. 90-91.) The source of these disparities is unmistakable: in Baldwin Park the assessed valuation per child totaled only $3,706; in Pasadena, assessed valuation was $13,706; while in Beverly Hills, the corresponding figure was $50,885 —a ratio of 1 to 4 to 13. (*Id.*) Thus, the state grants are inadequate to offset the inequalities inherent in a financing system based on widely varying local tax bases.

Furthermore, basic aid, which constitutes about half of the state educational funds (Legislative Analyst, Public School Finance, Part II, The State School Fund: Its Derivation, Distribution and Apportionment (1970) p. 9), actually widens the gap between rich and poor districts. (See Cal. Senate Fact Finding Committee on Revenue and Taxation, State and Local Fiscal Relationships in Public Education in California (1965) p. 19.) Such aid is

district's foundation level to the areawide total. Thus, poor districts effectively share in the higher tax bases of their wealthier neighbors. However, any district is still free to tax itself at a rate higher than $1 or $.80; such additional revenue is retained entirely by the taxing district.

[9]Statistics compiled by the legislative analyst show the following range of assessed valuations per pupil for the 1969-1970 school year:

|  | Elementary | High School |
|---|---|---|
| Low | $103 | 11,959 |
| Median | 19,600 | 41,300 |
| High | 952,156 | 349,093 |

(Legislative Analyst, Part V, *supra*, p. 7.)

Per pupil expenditures during that year also varied widely:

|  | Elementary | High School | Unified |
|---|---|---|---|
| Low | $407 | $722 | $612 |
| Median | 672 | 898 | 766 |
| High | 2,586 | 1,767 | 2,414 |

(*Id.* at p. 8.)

Similar spending disparities have been noted throughout the country, particularly when suburban communities and urban ghettos are compared. (See, e.g., Report of the National Advisory Commission on Civil Disorders (Bantam ed. 1968) pp. 434-436; U.S. Commission on Civil Rights, Racial Isolation in the Public Schools (1967) pp. 25-31; Conant, Slums and Suburbs (1961) pp. 2-3; Levi, *The University, The Professions, and the Law* (1968) 56 Cal.L.Rev. 251, 258-259.)

distributed on a uniform per pupil basis to all districts, irrespective of a district's wealth. Beverly Hills, as well as Baldwin Park, receives $125 from the state for each of its students.

For Baldwin Park the basic grant is essentially meaningless. Under the foundation program the state must make up the difference between $355 per elementary child and $47.91, the amount of revenue per child which Baldwin Park could raise by levying a tax of $1 per $100 of assessed valuation. Although under present law, that difference is composed partly of basic aid and partly of equalization aid, if the basic aid grant did not exist, the district would still receive the same amount of state aid—all in equalizing funds.

For Beverly Hills, however, the $125 flat grant has real financial significance. Since a tax rate of $1 per $100 there would produce $870 per elementary student, Beverly Hills is far too rich to qualify for equalizing aid. Nevertheless, it still receives $125 per child from the state, thus enlarging the economic chasm between it and Baldwin Park. (See Coons, Clune & Sugarman, *Educational Opportunity: A Workable Constitutional Test of State Financial Structures* (1969) 57 Cal.L.Rev. 305, 315.)

## II

Having outlined the basic framework of California school financing, we take up plaintiffs' legal claims. ▮ Preliminarily, we reject their contention that the school financing system violates article IX, section 5 of the California Constitution, which states, in pertinent part: "The Legislature shall provide for *a system of common schools* by which a free school shall be kept up and supported in each district at least six months in every year . . . ." (Italics added.)[10] Plaintiffs' argument is that the present financing method produces separate and distinct systems, each offering an educational program which varies with the relative wealth of the district's residents.

We have held that the word "system," as used in article IX, section 5, implies a "unity of purpose as well as an entirety of operation, and the direction to the legislature to provide 'a' system of common schools means *one* system which shall be applicable to all the common schools within the state." (*Kennedy* v. *Miller* (1893) 97 Cal. 429, 432 [32 P. 558].) However,

---

[10] Plaintiffs' complaint does not specifically refer to article IX, section 5. Rather it alleges that the financing system "fails to meet minimum requirements of the . . . fundamental law and Constitution of the State of California," citing several other provisions of the state Constitution. Plaintiffs' first specific reference to article IX, section 5 is made in their brief on appeal. We treat plaintiffs' claim under this section as though it had been explicitly raised in their complaint.

we have never interpreted the constitutional provision to require equal school spending; we have ruled only that the educational system must be uniform in terms of the prescribed course of study and educational progression from grade to grade. (*Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664, 669, 673 [226 P. 926].)

We think it would be erroneous to hold otherwise. While article IX, section 5 makes no reference to school financing, section 6 of that same article specifically authorizes the very element of the fiscal system of which plaintiffs complain. Section 6 states, in part: "The Legislature shall provide for the levying annually by the governing board of each county, and city and county, of such school district taxes, at rates . . . as will produce in each fiscal year such revenue for each school district as the governing board thereof shall determine is required . . . ."

■    Elementary principles of construction dictate that where constitutional provisions can reasonably be construed to avoid a conflict, such an interpretation should be adopted. (*People* v. *Western Airlines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723], app. dism. (1954) 348 U.S. 859 [99 L.Ed. 677, 75 S.Ct. 87].)   ■    This maxim suggests that section 5 should not be construed to apply to school financing otherwise it would clash with section 6. If the two provisions were found irreconcilable, section 6 would prevail because it is more specific and was adopted more recently. (*Id.*; *County of Placer* v. *Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 189 [323 P.2d 753].) Consequently, we must reject plaintiffs' argument that the provision in section 5 for a "system of common schools" requires uniform educational expenditures.

### III

Having disposed of these preliminary matters, we take up the chief contention underlying plaintiffs' complaint, namely that the California public school financing scheme violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.[11]

---

[11]The complaint also alleges that the financing system violates article I, sections 11 and 21, of the California Constitution. Section 11 provides: "All laws of a general nature shall have a uniform operation." Section 21 states: "No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." We have construed these provisions as "substantially the equivalent" of the equal protection clause of the Fourteenth Amendment to the federal Constitution. (*Dept. of Mental Hygiene* v. *Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321].) Consequently, our analysis of plaintiffs' federal equal protection contention is also applicable to their claim under these state constitutional provisions.

■ As recent decisions of this court have pointed out, the United States Supreme Court has employed a two-level test for measuring legislative classifications against the equal protection clause. "In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]

■ "On the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' [fns. omitted] the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224]; *In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; see *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 [79 Cal. Rptr. 77, 456 P.2d 645].)

### A

### *Wealth as a Suspect Classification*

In recent years, the United States Supreme Court has demonstrated a marked antipathy toward legislative classifications which discriminate on the basis of certain "suspect" personal characteristics. One factor which has repeatedly come under the close scrutiny of the high court is wealth. "Lines drawn on the basis of wealth or property, like those of race [citation], are traditionally disfavored." (*Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663, 668 [16 L.Ed.2d 169, 173, 86 S.Ct. 1079].) Invalidating the Virginia poll tax in *Harper,* the court stated: "To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." (*Id.*) ■ "[A] careful examination on our part is especially warranted where lines are drawn on the basis of wealth . . . [a] factor which would independently render a classification highly suspect and thereby demand a more exacting judicial scrutiny. [Citations.]" (*McDonald* v. *Board of Elections* (1969) 394 U.S. 802, 807 [22 L.Ed.2d 739, 744, 89 S.Ct. 1404]. See also *Tate* v. *Short* (1971) 401 U.S. 395 [28 L.Ed. 2d 130, 91 S.Ct. 668]; *Williams* v. *Illinois* (1970) 399 U.S. 235 [26 L.Ed. 2d 586, 90 S.Ct. 2018]; *Roberts* v. *La Vallee* (1967) 389 U.S. 40 [19 L.Ed. 2d 41, 88 S.Ct. 194]; *Anders* v. *California* (1967) 386 U.S. 738 [18 L.Ed. 2d 493, 87 S.Ct. 1396]; *Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.

2d 811, 83 S.Ct. 814]; *Smith* v. *Bennett* (1961) 365 U.S. 708 [6 L.Ed.2d 39, 81 S.Ct. 895]; *Burns* v. *Ohio* (1959) 360 U.S. 252 [3 L.Ed.2d 1209, 79 S.Ct. 1164]; *Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]; *In re Antazo, supra,* 3 Cal.3d 100; see generally Michelman, *The Supreme Court, 1968 Term, Foreword: On Protecting the Poor Through the Fourteenth Amendment* (1969) 83 Harv.L.Rev. 7, 19-33.)

■ Plaintiffs contend that the school financing system classifies on the basis of wealth. We find this proposition irrefutable. As we have already discussed, over half of all educational revenue is raised locally by levying taxes on real property in the individual school districts. Above the foundation program minimum ($355 per elementary student and $488 per high school student), the wealth of a school district, as measured by its assessed valuation, is the major determinant of educational expenditures. Although the amount of money raised locally is also a function of the rate at which the residents of a district are willing to tax themselves, as a practical matter districts with small tax bases simply cannot levy taxes at a rate sufficient to produce the revenue that more affluent districts reap with minimal tax efforts. (See fn. 15, *infra,* and accompanying text.) For example, Baldwin Park citizens, who paid a school tax of $5.48 per $100 of assessed valuation in 1968-1969, were able to spend less than half as much on education as Beverly Hills residents, who were taxed only $2.38 per $100. (Cal. Dept. of Ed., *op. cit. supra,* Table III-16, p. 43).

Defendants vigorously dispute the proposition that the financing scheme discriminates on the basis of wealth. Their first argument is essentially this: through *basic* aid, the state distributes school funds equally to all pupils; through *equalization* aid, it distributes funds in a manner beneficial to the poor districts. However, state funds constitute only one part of the entire school fiscal system.[12] The foundation program partially alleviates the great disparities in local sources of revenue, but the system as a whole generates school revenue in proportion to the wealth of the individual district.[13]

---

[12]The other major portion is, of course, locally raised revenue; it is clear that such revenue is a part of the overall educational financing system. As we pointed out, *supra,* article IX, section 6 of the state Constitution specifically authorizes local districts to levy school taxes. Section 20701 et seq. of the Education Code details the mechanics of this process.

[13]Defendants ask us to follow *Briggs* v. *Kerrigan* (D.Mass. 1969) 307 F.Supp. 295, affd. (1st Cir. 1970) 431 F.2d 967, which held that the City of Boston did not violate the equal protection clause in failing to provide federally subsidized lunches at all of its schools. The court found that such lunches were offered only at schools

Defendants also argue that neither assessed valuation per pupil nor expenditure per pupil is a reliable index of the wealth of a district or of its residents. The former figure is untrustworthy, they assert, because a district with a low total assessed valuation but a minuscule number of students will have a high per pupil tax base and thus appear "wealthy." Defendants imply that the proper index of a district's wealth is the total assessed valuation of its property. We think defendants' contention misses the point. The only meaningful measure of a district's wealth in the present context is not the absolute value of its property, but the ratio of its resources to pupils, because it is the latter figure which determines how much the district can devote to educating each of its students.[14]

But, say defendants, the expenditure per child does not accurately reflect a district's wealth because that expenditure is partly determined by the district's tax rate. Thus, a district with a high total assessed valuation might levy a low school tax, and end up spending the same amount per pupil as a poorer district whose residents opt to pay higher taxes. This argument is also meritless. Obviously, the richer district is favored when it can provide the same educational quality for its children with less tax effort. Furthermore, as a statistical matter, the poorer districts are financially unable to raise their taxes high enough to match the educational

which had kitchen and cooking facilities. As a result, in some cases the inexpensive meals were available to well-to-do children, but not to needy ones.

We do not find this decision relevant to the present action. Here, plaintiffs specifically allege that the allocation of school funds systematically provides greater educational opportunities to affluent children than are afforded to the poor. By contrast, in *Briggs* the court found no wealth-oriented discrimination: "There is no pattern such that schools with lunch programs predominate in areas of relative wealth and schools without the program in areas of economic deprivation." (*Id.* at p. 302.)

Furthermore, the nature of the right involved in the two cases is very different. The *instant action concerns the right to an education,* which we have determined to be fundamental. (See *infra.*) Availability of an inexpensive school lunch can hardly be considered of such constitutional significance.

[14]Gorman Elementary District in Los Angeles County, for example, has a total assessed valuation of $6,063,965, but only 41 students, yielding a per pupil tax base of $147,902. We find it significant that Gorman spent $1,378 per student on education in 1968-1969, even more than Beverly Hills. (Cal. Dept. of Ed., *op. cit. supra,* table IV-11, p. 90.)

We realize, of course, that a portion of the high per-pupil expenditure in a district like Gorman may be attributable to certain costs, like a principal's salary, which do not vary with the size of the school. On such expenses, small schools cannot achieve the economies of scale available to a larger district. To this extent, the high per-pupil spending in a small district may be a paper statistic, which is unrepresentative of significant differences in educational opporties. On the other hand, certain economic "inefficiencies," such as a low pupil-teacher ratio, may have a positive educational impact. The extent to which high spending in such districts represents actual educational advantages is, of course, a matter of proof. (See fn. 16, *infra.* See generally *Hobson* v. *Hansen* (D.C. 1967) 269 F.Supp. 401, 437, affd. *sub nom. Smuck* v. *Hobson* (1969) 408 F.2d 175 [132 App.D.C. 372].)

offerings of wealthier districts. (Legislative Analyst, Part V, *supra,* pp. 8-9.) Thus, affluent districts can have their cake and eat it too: they can provide a high quality education for their children while paying lower taxes.[15] Poor districts, by contrast, have no cake at all.

Finally, defendants suggest that the wealth of a school district does not necessarily reflect the wealth of the families who live there. The simple answer to this argument is that plaintiffs have alleged that there is a

---

[15]"In some cases districts with low expenditure levels have correspondingly low tax rates. In many more cases, however, quite the opposite is true; districts with unusually low expenditures have unusually high tax rates owing to their limited tax base." (Legislative Analyst, Part V, *supra,* p. 8.) The following table demonstrates this relationship:

COMPARISON OF SELECTED TAX RATES AND EXPENDITURE LEVELS
IN SELECTED COUNTIES
1968-1969

| County | ADA | Assessed Value per ADA | Tax Rate | Expenditure per ADA |
|---|---|---|---|---|
| Alameda | | | | |
|   Emery Unified | 586 | $100,187 | $2.57 | $2,223 |
|   Newark Unified | 8,638 | 6,048 | 5.65 | 616 |
| Fresno | | | | |
|   Coalinga Unified | 2,640 | $ 33,244 | $2.17 | $ 963 |
|   Clovis Unified | 8,144 | 6,480 | 4.28 | 565 |
| Kern | | | | |
|   Rio Bravo Elementary | 121 | $136,271 | $1.05 | $1,545 |
|   Lamont Elementary | 1,847 | 5,971 | 3.06 | 533 |
| Los Angeles | | | | |
|   Beverly Hills Unified | 5,542 | $ 50,885 | $2.38 | $1,232 |
|   Baldwin Park Unified | 13,108 | 3,706 | 5.48 | 577 |

(*Id.* at p. 9.)

This fact has received comment in reports by several California governmental units. "[S]ome school districts are able to provide a high-expenditure school program at rates of tax which are relatively low, while other districts must tax themselves heavily to finance a low-expenditure program. . . . [Par.] One significant criterion of a public activity is that it seeks to provide equal treatment of equals. The present system of public education . . . in California fails to meet this criterion, both with respect to provision of services and with respect to the geographic distribution of the tax burden." (Cal. Senate Fact Finding Committee on Revenue and Taxation, *op. cit. supra,* p. 20.)

"California's present system of school support is based largely on a sharing between the state and school districts of the expenses of education. In this system of sharing, the school district has but one source of revenue—the property tax. Therefore, its ability to share depends upon its assessed valuation per pupil and its tax effort. The variations existing in local ability (assessed valuation per pupil) and tax effort (tax rate) present problems which deny equal educational opportunity and local tax equity." (Cal. State Dept. of Ed., Recommendations on Public School Support (1967) p. 69.) (Quoted in Horowitz & Neitring, *Equal Protection Aspects of Inequalities in Public Education and Public Assistance Programs from Place to Place Within a State* (1968) 15 U.C.L.A. L.Rev. 787, 806.)

correlation between a district's per pupil assessed valuation and the wealth of its residents and we treat these material facts as admitted by the demurrers.

More basically, however, we reject defendants' underlying thesis that classification by wealth is constitutional so long as the wealth is that of the district, not the individual. We think that discrimination on the basis of district wealth is equally invalid. The commercial and industrial property which augments a district's tax base is distributed unevenly throughout the state. To allot more educational dollars to the children of one district than to those of another merely because of the fortuitous presence of such property is to make the quality of a child's education dependent upon the location of private commercial and industrial establishments.[16] Surely, this is to rely on the most irrelevant of factors as the basis for educational financing.

Defendants, assuming for the sake of argument that the financing system does classify by wealth, nevertheless claim that no constitutional infirmity is involved because the complaint contains no allegation of purposeful or intentional discrimination. (Cf. *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125].) Thus, defendants contend, any unequal treatment is only de facto, not de jure. Since the United States

---

[16]Defendants contend that different levels of educational expenditure do not affect the quality of education. However, plaintiffs' complaint specifically alleges the contrary, and for purposes of testing the sufficiency of a complaint against a general demurrer, we must take its allegations to be true.

Although we recognize that there is considerable controversy among educators over the relative impact of educational spending and environmental influences on school achievement (compare Coleman et al., Equality of Educational Opportunity (U.S. Office of Ed. 1966) with Guthrie, Kleindorfer, Levin & Stout, Schools and Inequality (1971); see generally Coons, Clune & Sugarman, *supra*, 57 Cal.L.Rev. 305, 310-311, fn. 16), we note that the several courts which have considered contentions similar to defendants' have uniformly rejected them.

In *McInnis* v. *Shapiro* (N.D.Ill. 1968) 293 F.Supp. 327, affd. mem. *sub nom.* *McInnis* v. *Ogilvie* (1969) 394 U.S. 322 [22 L.Ed.2d 308, 89 S.Ct. 1197], heavily relied on by defendants, a three-judge federal court stated: "Presumably, students receiving a $1,000 education are better educated that [*sic*] those acquiring a $600 schooling." (Fn. omitted.) (*Id.* at p. 331.) In *Hargrave* v. *Kirk* (M.D.Fla. 1970) 313 F.Supp. 944, vacated on other grounds *sub nom.* *Askew* v. *Hargrave* (1971) 401 U.S. 476 [28 L.Ed.2d 196, 91 S.Ct. 856], the court declared: "Turning now to the defenses asserted, it may be that in the abstract 'the difference in dollars available does not necessarily produce a difference in the quality of education.' But this abstract statement must give way to proof to the contrary in this case." (*Id.* at p. 947.)

Spending differentials of up to $130 within a district were characterized as "spectacular" in *Hobson* v. *Hansen, supra,* 269 F.Supp. 401. Responding to defendants' claim that the varying expenditures did not reflect actual educational benefits, the court replied: "To a great extent . . . defendants' own evidence verifies that the comparative per pupil figures do refer to actual educational advantages in the high-cost schools, especially with respect to the caliber of the teaching staff." (*Id.* at p. 438.)

Supreme Court has not held de facto school segregation on the basis of race to be unconstitutional, so the argument goes, de facto classifications on the basis of wealth are presumptively valid.

We think that the whole structure of this argument must fall for want of a solid foundation in law and logic. First, none of the wealth classifications previously invalidated by the United States Supreme Court or this court has been the product of purposeful discrimination. Instead, these prior decisions have involved "unintentional" classifications whose impact simply fell more heavily on the poor.

For example, several cases have held that where important rights are at stake, the state has an affirmative obligation to relieve an indigent of the burden of his own poverty by supplying without charge certain goods or services for which others must pay. In *Griffin* v. *Illinois, supra,* 351 U.S. 12, the high court ruled that Illinois was required to provide a poor defendant with a free transcript on appeal.[17] *Douglas* v. *California, supra,* 372 U.S. 353 held that an indigent person has a right to court-appointed counsel on appeal.

Other cases dealing with the factor of wealth have held that a state may not impose on an indigent certain payments which, although neutral on their face, may have a discriminatory *effect.* In *Harper* v. *Virginia Bd. of Elections, supra,* 383 U.S. 663, the high court struck down a $1.50 poll tax, not because its *purpose* was to deter indigents from voting, but because its *result* might be such. (*Id.* at p. 666, fn. 3 [16 L.Ed.2d at p. 172].) We held in *In re Antazo, supra,* 3 Cal.3d 100 that a poor defendant was denied equal protection of the law if he was imprisoned simply because he could not afford to pay a fine. (Accord, *Tate* v. *Short, supra,* 401 U.S. 395; *Williams* v. *Illinois, supra,* 399 U.S. 235;[18] see *Boddie* v. *Connecticut*

---

[17]Justice Harlan, dissenting in *Griffin,* declared: "Nor is this a case where the State's own action has prevented a defendant from appealing. [Citations.] All that Illinois has done is to fail to alleviate the consequences of differences in economic circumstances that exist wholly apart from any state action. [Par.] The Court thus holds that, at least in this area of criminal appeals, the Equal Protection Clause imposes on the States an affirmative duty to lift the handicaps flowing from differences in economic circumstances." (351 U.S. at p. 34 [100 L.Ed. at p. 907].)

[18]Numerous cases involving racial classifications have rejected the contention that purposeful discrimination is a prerequisite to establishing a violation of the equal protection clause. In *Hobson* v. *Hansen, supra,* 269 F.Supp. 401, Judge Skelly Wright stated: "Orthodox equal protection doctrine can be encapsulated in a single rule: government action which without justification imposes unequal burdens or awards unequal benefits is unconstitutional. The complaint that analytically no violation of equal protection vests unless the inequalities stem from a deliberately discriminatory plan is simply false. Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary quality of thoughtlessness can be as

(1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780], discussed fn. 21 *infra.*) In summary, prior decisions have invalidated classifications based on wealth even in the absence of a discriminatory motivation.

We turn now to defendants' related contention that the instant case involves at most de facto discrimination. We disagree. Indeed, we find the case unusual in the extent to which governmental action *is* the cause of the wealth classifications. The school funding scheme is mandated in every detail by the California Constitution and statutes. Although private residential and commercial patterns may be partly responsible for the distribution of assessed valuation throughout the state, such patterns are shaped and hardened by zoning ordinances and other governmental land-use controls which promote economic exclusivity. (Cf. *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 956 [92 Cal.Rptr. 309, 479 P.2d 669].) Governmental action drew the school district boundary lines, thus determining how much local wealth each district would contain. (Cal. Const., art. IX, § 14; Ed. Code, § 1601 et seq.; *Worthington S. Dist.* v. *Eureka S. Dist.* (1916) 173 Cal. 154, 156 [159 P. 437]; *Hughes* v. *Ewing* (1892) 93 Cal. 414, 417 [28 P. 1067]; *Mountain View Sch. Dist.* v. *City Council* (1959) 168 Cal.App.2d 89, 97 [335 P.2d 957].) Compared with *Griffin* and *Douglas,* for example, official activity has played a significant role in establishing the economic classifications challenged in this action.[19]

Finally, even assuming arguendo that defendants are correct in their contention that the instant discrimination based on wealth is merely de facto, and not de jure,[20] such discrimination cannot be justified by analogy

disastrous and unfair to private rights and the public interest as the perversity of a willful scheme. [Par.] Theoretically, therefore, purely irrational inequalities even between two schools in a culturally homogenous, uniformly white suburb would raise a real constitutional question." (Fns. omitted.) (*Id.* at p. 497.) (See also *Hawkins* v. *Town of Shaw, Mississippi* (5th Cir. 1971) 437 F.2d 1286; *Norwalk CORE* v. *Norwalk Redevelopment Agency* (2d Cir. 1968) 395 F.2d 920, 931.) No reason appears to impose a more stringent requirement where wealth discrimination is charged.

[19]One commentator has described state involvement in school financing inequalities as follows: "[The states] have determined that there will be public education, collectively financed out of general taxes; they have determined that the collective financing will not rest mainly on a statewide tax base, but will be largely decentralized to districts; they have composed the district boundaries, thereby determining wealth distribution among districts; in so doing, they have not only sorted education-consuming households into groups of widely varying average wealth, but they have sorted non-school-using taxpayers—households and others—quite unequally among districts; and they have made education compulsory." His conclusion is that "[s]tate involvement and responsibility are indisputable." (Michelman, *supra,* 83 Harv.L.Rev. 7, 50, 48.)

[20]We recently pointed out the difficulty of categorizing *racial* segregation as either de facto or de jure. (*San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d

to de facto *racial* segregation. Although the United States Supreme Court has not yet ruled on the constitutionality of de facto racial segregation, this court eight years ago held such segregation invalid, and declared that school boards should take affirmative steps to alleviate racial imbalance, however created. (*Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 881 [31 Cal.Rptr. 606, 382 P.2d 878]; *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937.) Consequently, any discrimination based on wealth can hardly be vindicated by reference to de facto racial segregation, which we have already condemned. In sum, we are of the view that the school financing system discriminates on the basis of the wealth of a district and its residents.

## B

### Education as a Fundamental Interest

But plaintiffs' equal protection attack on the fiscal system has an additional dimension. They assert that the system not only draws lines on the basis of wealth but that it "touches upon," indeed has a direct and significant impact upon, a "fundamental interest," namely education. It is urged that these two grounds, particularly in combination, establish a demonstrable denial of equal protection of the laws. To this phase of the argument we now turn our attention.

Until the present time wealth classifications have been invalidated only in conjunction with a limited number of fundamental interests—rights of defendants in criminal cases (*Griffin; Douglas; Williams; Tate; Antazo*) and voting rights (*Harper; Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; cf. *McDonald* v. *Board of Elections, supra,* 394 U.S. 802).[21] Plaintiffs' contention—that education is a fundamental interest which may not be conditioned on wealth—is not supported by any direct authority.[22]

---

937, 956-957.) We think the same reasoning applies to classifications based on wealth. Consequently, we decline to attach an oversimplified label to the complex configuration of public and private decisions which has resulted in the present allocation of educational funds.

[21] But in *Boddie* v. *Connecticut, supra,* 401 U.S. 371, the Supreme Court held that poverty cannot constitutionally bar an individual seeking a divorce from access to the *civil* courts. Using a due process, rather than an equal protection, rationale, the court ruled that an indigent could not be required to pay court fees and costs for service of process as a precondition to commencing a divorce action.

[22] In *Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322], in which the Supreme Court invalidated state minimum residence requirements for welfare benefits, the high court indicated, in dictum, that certain wealth discrimination in the area of education would be unconstitutional: "We recognize that a State

We, therefore, begin by examining the indispensable role which education plays in the modern industrial state. This role, we believe, has two significant aspects: first, education is a major determinant of an individual's chances for economic and social success in our competitive society; second, education is a unique influence on a child's development as a citizen and his participation in political and community life. "[T]he pivotal position of education to success in American society and its essential role in opening up to the individual the central experiences of our culture lend it an importance that is undeniable." (Note, *Development in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1129.) Thus, education is the lifeline of both the individual and society.

The fundamental importance of education has been recognized in other contexts by the United States Supreme Court and by this court. These decisions—while not *legally* controlling on the exact issue before us—are persuasive in their accurate factual description of the significance of learning.[23]

---

has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools." (*Id.* at p. 633 [22 L.Ed.2d at p. 614].) Although the high court referred to actual exclusion from school, rather than discrimination in expenditures for education, we think the constitutional principle is the same. (See fn. 24, and accompanying text.)

A federal Court of Appeals has also held that education is arguably a fundamental interest. In *Hargrave* v. *McKinney* (5th Cir. 1969) 413 F.2d 320, the Fifth Circuit ruled that a three-judge district court must be convened to consider the constitutionality of a Florida statue which limited the local property tax rate which a county could levy in raising school revenue. Plaintiffs contended that the statute violated the equal protection clause because it allowed counties with a high per-pupil assessed valuation to raise much more local revenue than counties with smaller tax bases. The court stated: "The equal protection argument advanced by plaintiffs is the crux of the case. Noting that lines drawn on wealth are suspect [fn. omitted] and that we are here dealing with interests which may well be deemed fundamental, [fn. omitted] we cannot say that there is no reasonably arguable theory of equal protection which would support a decision in favor of the plaintiffs. [Citations.]" (*Id.* at p. 324.)

On remand, a three-judge court held the statute unconstitutional because there was no rational basis for the discriminatory effect which it had in poor counties. Having invalidated the statute under the traditional equal protection test, the court declined to consider plaintiffs' contention that education was a fundamental interest, requiring application of the "strict scrutiny" equal protection standard. (*Hargrave* v. *Kirk, supra,* 313 F.Supp. 944.) On appeal, the Supreme Court vacated the district court's decision on other grounds, but indicated that on remand the lower court should thoroughly explore the equal protection issue. (*Askew* v. *Hargrave* (1971) 401 U.S. 476 [28 L.Ed.2d 196, 91 S.Ct. 856].)

[23]Defendants contend that these cases are not of precedential value because they do not consider education in the context of wealth discrimination, but merely in the context of racial segregation or total exclusion from school. We recognize this distinc-

The classic expression of this position came in *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180], which invalidated de jure segregation by race in public schools. The high court declared: "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." (*Id.* at p. 493 [98 L.Ed. at p. 880].)

The twin themes of the importance of education to the individual and to society have recurred in numerous decisions of this court. Most recently in *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, where we considered the validity of an anti-busing statute, we observed, "[u]nequal education, then, leads to unequal job opportunities, disparate income, and handicapped ability to participate in the social, cultural, and political activity of our society." (*Id.* at p. 950.) Similarly, in *Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, which raised a claim that school districts had been gerrymandered to avoid integration, this court said: "In view of the importance of education to society and to the individual child, the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis." (*Id.* at p. 880.)

When children living in remote areas brought an action to compel local school authorities to furnish them bus transportation to class, we stated: "We indulge in no hyperbole to assert that society has a compelling interest in affording children an opportunity to attend school. This was evidenced more than three centuries ago, when Massachusetts provided the first public school system in 1647. [Citation.] And today an education has become the *sine qua non* of useful existence. . . . In light of the public interest in conserving the resource of young minds, we must unsympathetically examine any action of a public body which has the effect of depriving children of the opportunity to obtain an education." (Fn. omitted.)

---

tion, but cannot agree with defendants' conclusion. Our quotation of these cases is not intended to suggest that they *control* the legal result which we reach here, but simply that they eloquently express the crucial importance of education.

(*Manjares* v. *Newton* (1966) 64 Cal.2d 365, 375-376 [49 Cal.Rptr. 805, 411 P.2d 901].)

And long before these last mentioned cases, in *Piper* v. *Big Pine School Dist., supra,* 193 Cal. 664, where an Indian girl sought to attend state public schools, we declared: "[T]he common schools are doorways opening into chambers of science, art, and the learned professions, as well as into fields of industrial and commercial activities. Opportunities for securing employment are often more or less dependent upon the rating which a youth, as a pupil of our public institutions, has received in his school work. These are rights and privileges that cannot be denied." (*Id.* at p. 673; see also *Ward* v. *Flood* (1874) 48 Cal. 36.) Although *Manjares* and *Piper* involved actual exclusion from the public schools, surely the right to an education today means more than access to a classroom.[24] (See *Horowitz & Neitring, supra,* 15 U.C.L.A. L.Rev. 787, 811.)

It is illuminating to compare in importance the right to an education with the rights of defendants in criminal cases and the right to vote—two "fundamental interests" which the Supreme Court has already protected against discrimination based on wealth. Although an individual's interest in his freedom is unique, we think that from a larger perspective, education may have far greater social significance than a free transcript or a court-appointed lawyer. "[E]ducation not only affects directly a vastly greater number of persons than the criminal law, but it affects them in ways which—to the state—have an enormous and much more varied significance. Aside from reducing the crime rate (the inverse relation is strong), education also supports each and every other value of a democratic society—participation, communication, and social mobility, to name but a few." (Fn. omitted.) (Coons, Clune & Sugarman, *supra,* 57 Cal.L.Rev. 305, 362-363.)

The analogy between education and voting is much more direct: both are crucial to participation in, and the functioning of, a democracy. Voting

---

[24]Cf. *Reynolds* v. *Sims* (1964) 377 U.S. 533, 562-563 [12 L.Ed.2d 506, 527-528, 84 S.Ct. 1362], where the Supreme Court asserted that the right to vote is impaired not only when a qualified individual is barred from voting, but also when the impact of his ballot is diminished by unequal electoral apportionment: "It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature. And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or ten times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. . . . Of course, the effect of state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical. . . . One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination.' [Citation.]" (Fn. omitted.)

has been regarded as a fundamental right because it is "preservative of other basic civil and political rights. . . .' (*Reynolds* v. *Sims, supra,* 377 U.S. 533, 562 [12 L.Ed.2d 506, 527]; see *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 370 [30 L.Ed. 220, 226, 6 S.Ct. 1064].) The drafters of the California Constitution used this same rationale—indeed, almost identical language—in expressing the importance of education. Article IX, section 1 provides: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." (See also *Piper* v. *Big Pine School Dist., supra,* 193 Cal. 664, 668.) At a minimum, education makes more meaningful the casting of a ballot. More significantly, it is likely to provide the understanding of, and the interest in, public issues which are the spur to involvement in other civic and political activities.

The need for an educated populace assumes greater importance as the problems of our diverse society become increasingly complex. The United States Supreme Court has repeatedly recognized the role of public education as a unifying social force and the basic tool for shaping democratic values. The public school has been termed "the most powerful agency for promoting cohesion among a heterogeneous democratic people . . . at once the symbol of our democracy and the most pervasive means for promoting our common destiny." (*McCollum* v. *Board of Education* (1948) 333 U.S. 203, 216, 231 [92 L.Ed. 649, 661, 669, 68 S.Ct. 461, 2 A.L.R.2d 1338] (Frankfurter, J., concurring).) In *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560], it was said that "Americans regard public schools as a most vital civic institution for the preservation of a democratic system of government." (*Id.* at p. 230 [10 L.Ed.2d at p. 863] (Brennan, J., concurring).)[25]

█   We are convinced that the distinctive and priceless function of edu-

---

[25]The sensitive interplay between education and the cherished First Amendment right of free speech has also received recognition by the United States Supreme Court. In *Shelton* v. *Tucker* (1960) 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247], the court declared: "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." (*Id.* at p. 487 [5 L.Ed.2d at p. 236].) Similarly, the court observed in *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589 [17 L.Ed.2d 629, 87 S.Ct. 675], "The classroom is peculiarly the 'market place of ideas.' The Nation's future depends upon leaders trained through wide exposure to [a] robust exchange of ideas. . . .". (*Id.* at p. 603 [17 L.Ed.2d at p. 640].) (See also *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 512 [21 L.Ed.2d 731, 741, 89 S.Ct. 733]; *Epperson* v. *Arkansas* (1968) 393 U.S. 97 [21 L.Ed.2d 228, 89 S.Ct. 266].)

cation in our society warrants, indeed compels, our treating it as a "fundamental interest."[26]

First, education is essential in maintaining what several commentators have termed "free enterprise democracy"—that is, preserving an individual's opportunity to compete successfully in the economic marketplace, despite a disadvantaged background. Accordingly, the public schools of this state are the bright hope for entry of the poor and oppressed into the mainstream of American society.[27]

Second, education is universally relevant. "Not every person finds it necessary to call upon the fire department or even the police in an entire lifetime. Relatively few are on welfare. Every person, however, benefits from education . . . ." (Fn. omitted.) (Coons, Clune & Sugarman, *supra*, 57 Cal.L.Rev. at p. 388.)

Third, public education continues over a lengthy period of life—between 10 and 13 years. Few other government services have such sustained, intensive contact with the recipient.

Fourth, education is unmatched in the extent to which it molds the

---

[26]The uniqueness of education was recently stressed by the United States Supreme Court in *Palmer* v. *Thompson* (1971) 403 U.S. 217 [29 L.Ed.2d 438, 91 S.Ct. 1940], where the court upheld the right of Jackson, Mississippi to close its municipal swimming pools rather than operate them on an integrated basis. Distinguishing an earlier Supreme Court decision which refused to permit the closing of schools to avoid desegregation, the court stated: "Of course that case did not involve swimming pools but rather public schools, an enterprise we have described as 'perhaps the most important function of state and local governments.' *Brown* v. *Board of Education, supra,* at 493." (*Id.* at p. 221 [29 L.Ed.2d at p. 442], fn. 6.) This theme was echoed in the concurring opinion of Justice Blackmun, who wrote: "The pools are not part of the city's educational system. They are a general municipal service of the nice-to-have but not essential variety, and they are a service, perhaps a luxury, not enjoyed by many communities." (*Id.* at p. 229 [29 L.Ed.2d at p. 447].)

[27]In this context, we find persuasive the following passage from *Hobson* v. *Hansen, supra,* 269 F.Supp. 401, which held, inter alia, that higher per-pupil expenditures in predominantly white schools than in black schools in the District of Columbia deprived "the District's Negro and poor public school children of their right to equal educational opportunity with the District's white and more affluent public school children." (*Id.* at p. 406.)

"If the situation were one involving racial imbalance but in some facility other than the public schools, or unequal educational opportunity but without any Negro or poverty aspects (e.g., unequal schools all within an economically homogeneous white suburb), it might be pardonable to uphold the practice on a minimal showing of rational basis. But the fusion of these two elements in *de facto* segregation in public schools irresistibly calls for additional justification. What supports this call is . . . the degree to which the poor and the Negro must rely on the public schools in rescuing themselves from their depressed cultural and economic condition . . . ." (*Id.* at p. 508.) Although we realize that the instant case does not present the racial aspects present in *Hobson,* we find compelling that decision's assessment of the important social role of the public schools.

personality of the youth of society. While police and fire protection, garbage collection and street lights are essentially neutral in their effect on the individual psyche, public education actively attempts to shape a child's personal development in a manner chosen not by the child or his parents but by the state. (Coons, Clune & Sugarman, *supra*, 57 Cal.L.Rev. at p. 389.) "[T]he influence of the school is not confined to how well it can teach the disadvantaged child; it also has a significant role to play in shaping the student's emotional and psychological make-up." (*Hobson v. Hansen*, *supra*, 269 F. Supp. 401, 483.)

Finally, education is so important that the state has made it compulsory—not only in the requirement of attendance but also by assignment to a particular district and school. Although a child of wealthy parents has the opportunity to attend a private school, this freedom is seldom available to the indigent. In this context, it has been suggested that "a child of the poor assigned willy-nilly to an inferior state school takes on the complexion of a prisoner, complete with a minimum sentence of 12 years." (Coons, Clune & Sugarman, *supra*, 57 Cal.L.Rev. at p. 388.)

## C

### *The Financing System Is Not Necessary to Accomplish a Compelling State Interest*

■ We now reach the final step in the application of the "strict scrutiny" equal protection standard—the determination of whether the California school financing system, as presently structured, is necessary to achieve a compelling state interest.

The state interest which defendants advance in support of the current fiscal scheme is California's policy "to strengthen and encourage local responsibility for control of public education." (Ed. Code, § 17300.) We treat separately the two possible aspects of this goal: first, the granting to local districts of effective decision-making power over the administration of their schools; and second, the promotion of local fiscal control over the amount of money to be spent on education.

The individual district may well be in the best position to decide whom to hire, how to schedule its educational offerings, and a host of other matters which are either of significant local impact or of such a detailed nature as to require decentralized determination. But even assuming arguendo that local administrative control may be a compelling state interest, the present financial system cannot be considered necessary to further this interest. No matter how the state decides to finance its system of public education, it can still leave this decision-making power in the hands of local districts.

The other asserted policy interest is that of allowing a local district to choose how much it wishes to spend on the education of its children. Defendants argue: "[I]f one district raises a lesser amount per pupil than another district, this is a matter of choice and preference of the individual district, and reflects the individual desire for lower taxes rather than an expanded educational program, or may reflect a greater interest within that district in such other services that are supported by local property taxes as, for example, police and fire protection or hospital services."

We need not decide whether such decentralized financial decision-making is a compelling state interest, since under the present financing system, such fiscal freewill is a cruel illusion for the poor school districts. We cannot agree that Baldwin Park residents care less about education than those in Beverly Hills solely because Baldwin Park spends less than $600 per child while Beverly Hills spends over $1,200. As defendants themselves recognize, perhaps the most accurate reflection of a community's commitment to education is the rate at which its citizens are willing to tax themselves to support their schools. Yet by that standard, Baldwin Park should be deemed far more devoted to learning than Beverly Hills, for Baldwin Park citizens levied a school tax of well over $5 per $100 of assessed valuation, while residents of Beverly Hills paid only slightly more than $2.

In summary, so long as the assessed valuation within a district's boundaries is a major determinant of how much it can spend for its schools, only a district with a large tax base will be truly able to decide how much it really cares about education. The poor district cannot freely choose to tax itself into an excellence which its tax rolls cannot provide. Far from being necessary to promote local fiscal choice, the present financing system actually deprives the less wealthy districts of that option.

It is convenient at this point to dispose of two final arguments advanced by defendants. They assert, first, that territorial uniformity in respect to the present financing system is not constitutionally required; and secondly, that if under an equal protection mandate relative wealth may not determine the quality of public education, the same rule must be applied to all tax-supported public services.

In support of their first argument, defendants cite *Salsburg* v. *Maryland* (1954) 346 U.S. 545 [98 L.Ed. 281, 74 S.Ct. 280] and *Board of Education* v. *Watson, supra,* 63 Cal.2d 829. We do not find these decisions apposite in the present context, for neither of them involved the basic

constitutional interests here at issue.[28] ▮ We think that two lines of recent decisions have indicated that where fundamental rights or suspect classifications are at stake, a state's general freedom to discriminate on a geographical basis will be significantly curtailed by the equal protection clause. (See Horowitz & Neitring, *supra,* 15 U.C.L.A. L.Rev. 787.)

The first group of precedents consists of the school closing cases, in which the Supreme Court has invalidated efforts to shut schools in one part of a state while schools in other areas continued to operate. In *Griffin* v. *School Board* (1964) 377 U.S. 218 [12 L.Ed.2d 256, 84 S.Ct. 1226] the court stated: "A state, of course, has a wide discretion in deciding whether laws shall operate statewide or shall operate only in certain counties, the legislature 'having in mind the needs and desires of each.' *Salsburg* v. *Maryland, supra,* 346 U.S., at 552. . . . But the record in the present case could not be clearer that Prince Edward's public schools were closed . . . for one reason, and one reason only: to ensure . . . that white and colored children in Prince Edward County would not, under any circumstances, go to the same school. Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one . . . ." *(Id.* at p. 231 [12 L.Ed.2d at p. 265].)

Similarly, *Hall* v. *St. Helena Parish School Board* (E.D.La. 1961) 197 F.Supp. 649, affd. mem. (1962) 368 U.S. 515 [7 L.Ed.2d 521, 82 S.Ct. 529] held that a statute permitting a local district faced with integration to close its schools was constitutionally defective, not merely because of its racial consequences: "More generally, the Act is assailable because its application in one parish, while the state provides public schools elsewhere, would unfairly discriminate against the residents of that parish, irrespective of race. . . . [A]bsent a reasonable basis for so classifying, a state cannot close the public schools in one area while, at the same time, it maintains schools elsewhere with public funds." (Fn. omitted.) *(Id.* at pp. 651, 656.)

---

[28]*Salsburg* upheld a Maryland statute which allowed illegally seized evidence to be admitted in gambling prosecutions in one county, while barring use of such evidence elsewhere in the state. But when *Salsburg* was decided, the Fourth and Fourteenth Amendments had not yet been interpreted to prohibit the admission of unlawfully procured evidence in state trials. (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].) Consequently, the Supreme Court in *Salsburg* treated the Maryland statute as simply establishing a rule of evidence, which was purely procedural in nature. (346 U.S. at p. 550 [98 L.Ed. at p. 287]; see pp. 554-555 [98 L.Ed. p. 290] (Douglas, J., dissenting).)

In *Watson* we rejected a constitutional attack on a statute which required special duties of the tax assessor in counties with a population in excess of four million, even though we recognized that only Los Angeles County would be affected by the legislation. In both cases, the courts simply applied the traditional equal protection test and sustained the provision after finding some rational basis for the geographic classification.

The *Hall* court specifically distinguished *Salsburg* stating: "The holding of Salsburg v. State of Maryland permitting the state to treat differently, for different localities, the rule against admissibility of illegally obtained evidence no longer obtains in view of Mapp v. Ohio, 367 U.S. 643 . . . . Accordingly, reliance on that decision for the proposition that there is no constitutional inhibition to geographic discrimination in the area of civil rights is misplaced. . . . [T]he Court [in *Salsburg*] emphasized that the matter was purely 'procedural' and 'local.' Here, the substantive classification is discriminatory . . . ." (*Id.* at pp. 658-659, fn. 29.)

In the second group of cases, dealing with apportionment, the high court has held that accidents of geography and arbitrary boundary lines of local government can afford no ground for discrimination among a state's citizens. (Kurland, *Equal Educational Opportunity: The Limits of Constitutional Jurisprudence Undefined* (1968) 35 U.Chi.L.Rev. 583, 585; see also Wise, Rich Schools, Poor Schools: The Promise of Equal Educational Opportunity (1969) pp. 66-92.) Specifically rejecting attempts to justify unequal districting on the basis of various geographic factors, the court declared: "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race [citation] or economic status, *Griffin* v. *Illinois*, 351 U.S. 12, *Douglas* v. *California*, 372 U.S. 353. . . . The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." (*Reynolds* v. *Sims, supra*, 377 U.S. 533, 566, 567 [12 L.Ed.2d 506, 529, 530].) If a voter's address may not determine the weight to which his ballot is entitled, surely it should not determine the quality of his child's education.[29]

Defendants' second argument boils down to this: if the equal protection clause commands that the relative wealth of school districts

---

[29]Defendants also claim that permitting school districts to retain their locally raised property tax revenue does not violate equal protection because "[t]he power of a legislature in respect to the allocation and distribution of public funds is not limited by any requirement of uniformity or of equal protection of the laws." As an abstract proposition of law, this statement is clearly overbroad. For example, a state Legislature cannot make tuition grants from state funds to segregated private schools in order to avoid integration. (*Brown* v. *South Carolina State Board of Education* (D.S.C. 1968) 296 F.Supp. 199, affd. mem. (1968) 393 U.S. 222 [21 L.Ed.2d 391, 89 S.Ct. 449]; *Poindexter* v. *Louisiana Financial Assistance Commission* (E.D.La. 1967) 275 F.Supp. 833, affd. mem. (1968) 389 U.S. 571 [19 L.Ed.2d 780, 88 S.Ct. 693].) The cases cited by defendants are inapplicable in the present context. Neither *Hess* v. *Mullaney* (9th Cir. 1954) 213 F.2d 635, cert. den. *sub nom. Hess* v. *Dewey* (1954) 348 U.S. 836 [99 L.Ed. 659, 75 S.Ct. 50], nor *Gen. Amer. Tank Car Corp.* v. *Day* (1926) 270 U.S. 367 [70 L.Ed. 635, 46 S.Ct. 234] involved a claim to a fundamental constitutional interest, such as education. (See Coons, Clune & Sugarman, *supra*, 57 Cal.L.Rev. at p. 371, fn. 184.)

may not determine the quality of public education, it must be deemed to direct the same command to all governmental entities in respect to all tax-supported public services;[30] and such a principle would spell the destruction of local government. We unhesitatingly reject this argument. We cannot share defendants' unreasoned apprehensions of such dire consequences from our holding today. Although we intimate no views on other governmental services,[31] we are satisfied that, as we have explained, its uniqueness among public activities clearly demonstrates that *education* must respond to the command of the equal protection clause.

We, therefore, arrive at these conclusions. The California public school financing system, as presented to us by plaintiffs' complaint supplemented by matters judicially noticed, since it deals intimately with education, obviously touches upon a fundamental interest. For the reasons we have explained in detail, this system conditions the full entitlement to such interest on wealth, classifies its recipients on the basis of their collective affluence and makes the quality of a child's education depend upon the resources of his school district and ultimately upon the pocketbook of his parents. We find that such financing system as presently constituted is not necessary to the attainment of any compelling state interest. Since it does not withstand the requisite "strict scrutiny," it denies to the plaintiffs

---

[30]In support of this contention, defendants cite the following quotation from *MacMillan Co.* v. *Clarke* (1920) 184 Cal. 491, 500 [194 P. 1030, 17 A.L.R. 288], in which we upheld the constitutionality of a statute providing free textbooks to high school pupils: "[T]he free school system . . . is not primarily a service to the individual pupils, but to the community, just as fire and police protection, public libraries, hospitals, playgrounds, and the numerous other public service utilities which are provided by taxation, and minister to individual needs, are for the benefit of the general public." Whatever the case as to the other services, we think that in this era of high geographic mobility, the "general public" benefited by education is not merely the particular community where the schools are located, but the entire state.

[31]We note, however, that the Court of Appeals for the Fifth Circuit has recently held that the equal protection clause forbids a town to discriminate racially in the provision of municipal services. In *Hawkins* v. *Town of Shaw, Mississippi, supra,* 437 F.2d 1286, the court held that the town of Shaw, Mississippi had an affirmative duty to equalize such services as street paving and lighting, sanitary sewers, surface water drainage, water mains and fire hydrants. The decision applied the "strict scrutiny" equal protection standard and reversed the decision of the district court which, relying on the traditional test, had found no constitutional infirmity.

Although racial discrimination was the basis of the decision, the court intimated that wealth discrimination in the provision of city services might also be invalid: "Appellants also alleged the discriminatory provision of municipal services based on wealth. This claim was dropped on appeal. It is interesting to note, however, that the Supreme Court has stated that wealth as well as race renders a classification highly suspect and thus demanding of a more exacting judicial scrutiny. [Citation.]" (*Id.* at p. 1287, fn. 1.)

and others similarly situated the equal protection of the laws.[32] If the allegations of the complaint are sustained, the financial system must fall and the statutes comprising it must be found unconstitutional.

## IV

■ Defendants' final contention is that the applicability of the equal protection clause to school financing has already been resolved adversely to plaintiffs' claims by the Supreme Court's summary affirmances in *McInnis* v. *Shapiro, supra,* 293 F.Supp. 327, affd. mem. *sub nom. McInnis* v. *Ogilvie* (1969) 394 U.S. 322 [22 L.Ed.2d 308, 89 S.Ct. 1197], and *Burruss* v. *Wilkerson* (W.D.Va. 1969) 310 F.Supp. 572, affd. mem. (1970) 397 U.S. 44 [26 L.Ed.2d 37, 90 S.Ct. 812]. The trial court in the instant action cited *McInnis* in sustaining defendants' demurrers.

The plaintiffs in *McInnis* challenged the Illinois school financing system, which is similar to California's, as a violation of the equal protection and due process clauses of the Fourteenth Amendment because of the wide variations among districts in school expenditures per pupil. They contended that *"only* a financing system which apportions public funds according to the educational needs of the students satisfies the Fourteenth Amendment." (Fn. omitted.) (293 F.Supp. at p. 331.)

A three-judge federal district court concluded that the complaint stated no cause of action "for two principal reasons: (1) the Fourteenth Amendment does not require that public school expenditures be made only on the basis of pupils' *educational needs,* and (2) the lack of judicially manageable standards makes this controversy nonjusticiable." (Fn. omitted.) (293 F.Supp. at p. 329.) (Italics added.) The court additionally rejected the applicability of the strict scrutiny equal protection standard and ruled that the Illinois financing scheme was rational because it was "designed to allow individual localities to determine their own tax burden

---

[32]The United States Commission on Civil Rights has stated that "[i]t may well be that the substantial fiscal and tangible inequalities which at present exist between city and suburban school districts . . . contravene the 14th amendment's equal protection guarantee." Relying on the quotation from *Brown* v. *Board of Education, supra,* — " 'where a State provides education, it must be provided to all on equal terms' " — the commission concluded that this passage "would appear to render at least those substantial disparities which are readily identifiable—such as disparities in fiscal support, average per pupil expenditure, and average pupil-teacher ratios— unconstitutional." The commission also cited the reapportionment decisions and *Griffin* v. *Illinois, supra,* concluding, "Here, as in *Griffin,* the State may be under no obligation to provide the service, but having undertaken to provide it, the State must insure that the benefit is received by the poor as well as the rich in substantially equal measure." (U.S. Commission on Civil Rights, *op. cit. supra,* p. 261, fn. 282.)

according to the importance which they place upon public schools." (*Id.* at p. 333.) The United States Supreme Court affirmed per curiam with the following order: "The motion to affirm is granted and the judgment is affirmed." (394 U.S. 322 [22 L.Ed.2d 308, 89 S.Ct. 1197].) No cases were cited in the high court's order; there was no oral argument.[33]

Defendants argue that the high court's summary affirmance forecloses our independent examination of the issues involved. We disagree.

Since *McInnis* reached the Supreme Court by way of appeal from a three-judge federal court, the high court's jurisdiction was not discretionary. (28 U.S.C. § 1253 (1964).) In these circumstances, defendants are correct in stating that a summary affirmance is formally a decision on the merits. However, the significance of such summary dispositions is often unclear, especially where, as in *McInnis,* the court cites no cases as authority and guidance. One commentator has stated, "It has often been observed that the dismissal of an appeal, technically an adjudication on the merits, is in practice often the substantial equivalent of a denial of certiorari."[34] (D. Currie, *The Three-Judge District Court in Constitutional Litigation* (1964) 32 U.Chi.L.Rev. 1, 74, fn. 365.) Frankfurter and Landis had suggested earlier that the pressure of the court's docket and differences of opinion among the judges operate "to subject the obligatory jurisdiction of the court to discretionary considerations not unlike those governing *certiorari.*" (Frankfurter & Landis, *The Business of the Supreme Court at October Term, 1929* (1930) 44 Harv.L.Rev. 1, 14.) Between 60 and 84 percent of appeals in recent years have been summarily handled by the Supreme Court without opinion. (Stern & Gressman, *op. cit. supra,* at p. 194.)[35]

---

[33]The plaintiffs in *Burruss* attacked the constitutionality of the Virginia school financing scheme. The decision of the district court, which dismissed their complaint for failure to state a claim, was cursory, containing little legal reasoning and relying on *McInnis* v. *Shapiro* for precedent. Consequently, the parties to the instant action have centered their discussion on *McInnis,* and we follow suit.

[34]Although the Supreme Court affirmed the *McInnis* decision, rather than dismissing the appeal, Currie's statement is probably entirely applicable anyway. In upholding decisions of lower courts on appeal, the Supreme Court "will affirm an appeal from a federal court, but will dismiss an appeal from a state court 'for want of a substantial federal question.' Only history would seem to justify this distinction. . . ." (Stern & Gressman, Supreme Court Practice (4th ed. 1969) at p. 233.)

[35]Summary disposition of a case by the Supreme Court need not prevent the court from later holding a full hearing on the same issue. The constitutionality of compulsory school flag salutes is a case in point. For three successive years—in *Leoles* v. *Landers* (1937) 302 U.S. 656 [82 L.Ed. 507, 58 S.Ct. 364]; *Hering* v. *State Board of Education* (1938) 303 U.S. 624 [82 L.Ed. 1087, 58 S.Ct. 752]; and *Johnson* v. *Deerfield* (1939) 306 U.S. 621 [83 L.Ed. 1027, 59 S.Ct. 791]—the Supreme Court summarily upheld lower court decisions which ruled such requirements constitutional. The very next year the high court granted certiorari in *Minersville District* v. *Gobitis*

At any rate, the contentions of the plaintiffs here are significantly different from those in *McInnis*. The instant complaint employs a familiar standard which has guided decisions of both the United States and California Supreme Courts: discrimination on the basis of wealth is an inherently suspect classification which may be justified only on the basis of a compelling state interest. (See cases, cited, part III, *supra*.) By contrast, the *McInnis* plaintiffs repeatedly emphasized "educational needs" as the proper standard for measuring school financing against the equal protection clause. The district court found this a "nebulous concept" (293 F.Supp. 327, 329, fn. 4) — so nebulous as to render the issue nonjusticiable for lack of " 'discoverable and manageable standards.' "[36] (*Id.* at p. 335.) In fact, the nonjusticiability of the "educational needs" standard was the basis for the *McInnis* holding; the district court's additional treatment of the substantive issues was purely dictum. In this context, a Supreme Court affirmance can hardly be considered dispositive of the significant and complex constitutional questions presented here.[37]

Assuming, as we must in light of the demurrers, the truth of the material allegations of the first stated cause of action, and considering in conjunction therewith the various matters which we have judicially noticed,

(1940) 310 U.S. 586 [84 L.Ed. 1375, 60 S.Ct. 1010, 127 A.L.R. 1493], thereby providing for oral argument and a full briefing of the issue. Although in *Gobitis* it adhered to its earlier per curiam decisions, three years later the court reversed its position and ruled such requirements invalid. (*Board of Education* v. *Barnette* (1943) 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674].)

[36]The plaintiffs in *Burruss* also relied on an "educational needs" standard in their attack on the Virgina school financing scheme, causing the district court to remark: "However, the courts have neither the knowledge, nor the means, nor the power to tailor the public moneys to fit the varying needs of these students throughout the State." (310 F.Supp. at p. 574.)

[37]In a comprehensive article on equal protection and school financing, three commentators have stated: "The meaning of *McInnis* v. *Shapiro* is ambiguous; but the case hardly seems another *Plessy* v. *Ferguson*. Probably but a temporary setback, it was the predictable consequence of an effort to force the court to precipitous and decisive action upon a novel and complex issue for which neither it nor the parties were ready. . . . [T]he plaintiffs' virtual absence of intelligible theory left the district court bewildered. Given the pace and character of the litigation, confusion of court and parties may have been inevitable, foreordaining the summary disposition of the appeal. The Supreme Court could not have been eager to consider an issue of this magnitude on such a record. Concededly its per curiam affirmance is formally a decision on the merits, but it need not imply the Court's permanent withdrawal from the field. It is probably most significant as an admonition to the protagonists to clarify the options before again invoking the Court's aid." (Coons, Clune & Sugarman, *supra*, 57 Cal.L.Rev. at pp. 308-309.)

The Supreme Court's willingness to order a full hearing by a federal district court on the issues raised in *Hargrave* v. *Kirk* (see *Askew* v. *Hargrave*, *supra*, 401 U.S. 476), indicates to us that it does not consider the applicability of the equal protection clause to educational financing foreclosed by its decisions in *McInnis* and *Burruss*.

we are satisfied that plaintiff children have alleged facts showing that the public school financing system denies them equal protection of the laws because it produces substantial disparities among school districts in the amount of revenue available for education.

The second stated cause of action by plaintiff parents by incorporating the first cause has, of course, sufficiently set forth the constitutionally defective financing scheme. Additionally, the parents allege that they are citizens and residents of Los Angeles County; that they are owners of real property assessed by the county; that some of defendants are county officials; and that as a direct result of the financing system they are required to pay taxes at a higher rate than taxpayers in many other districts in order to secure for their children the same or lesser educational opportunities. Plaintiff parents join with plaintiff children in the prayer of the complaint that the system be declared unconstitutional and that defendants be required to restructure the present financial system so as to eliminate its unconstitutional aspects. Such prayed for relief is strictly injunctive and seeks to prevent public officers of a county from acting under an allegedly void law. Plaintiff parents then clearly have stated a cause of action since "[i]f the . . . law is unconstitutional, then county officials may be enjoined from spending their time carrying out its provisions . . . ." (*Blair* v. *Pitchess* (1971) *ante*, p. 258, 269 [96 Cal.Rptr. 42, 486 P.2d 1242]; Code Civ. Proc., § 526a.)[38]

Because the third cause of action incorporates by reference the allegations of the first and second causes and simply seeks declaratory relief, it obviously sets forth facts sufficient to constitute a cause of action.

In sum, we find the allegations of plaintiffs' complaint legally sufficient and we return the cause to the trial court for further proceedings. We emphasize, that our decision is not a final judgment on the merits. We deem it appropriate to point out for the benefit of the trial court on remand (see Code Civ. Proc., § 43) that if, after further proceedings, that court should enter final judgment determining that the existing system of public school financing is unconstitutional and invalidating said system in whole or in part, it may properly provide for the enforcement of the judgment in such a way as to permit an orderly transition from an unconstitutional to a constitutional system of school financing. As in the cases of school desegregation (see *Brown* v. *Board of Education* (1955) 349 U.S. 294 [99 L.Ed. 1083, 75 S.Ct. 753]) and legislative reapportion-

[38]Although plaintiff parents bring this action against state, as well as county officials, it has been held that state officers too may be sued under section 526a. (*Blair* v. *Pitchess, ante*, p. 258, at p. 267; *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 395 [86 Cal.Rptr. 305]; *Ahlgren* v. *Carr* (1962) 209 Cal.App.2d 248, 252-254 [25 Cal.Rptr. 887].)

ment (see *Silver* v. *Brown* (1965) 63 Cal.2d 270, 281 [46 Cal.Rptr. 308, 405 P.2d 132]), a determination that an existing plan of governmental operation denies equal protection does not necessarily require invalidation of past acts undertaken pursuant to that plan or an immediate implementation of a constitutionally valid substitute. ■ Obviously, any judgment invalidating the existing system of public school financing should make clear that the existing system is to remain operable until an appropriate new system, which is not violative of equal protection of the laws, can be put into effect.

By our holding today we further the cherished idea of American education that in a democratic society free public schools shall make available to all children equally the abundant gifts of learning. This was the credo of Horace Mann, which has been the heritage and the inspiration of this country. "I believe," he wrote, "in the existence of a great, immortal immutable principle of natural law, or natural ethics, — a principle antecedent to all human institutions, and incapable of being abrogated by any ordinance of man . . . which proves the *absolute right* to an education of every human being that comes into the world, and which, of course, proves the correlative duty of every government to see that the means of that education are provided for all. . . ." (Original italics.) (Old South Leaflets V, No. 109 (1846) pp. 177-180 (Tenth Annual Report to Mass. State Bd. of Ed.), quoted in Readings in American Education (1963 Lucio ed.) p. 336.)

The judgment is reversed and the cause remanded to the trial court with directions to overrule the demurrers and to allow defendants a reasonable time within which to answer.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Dunn in the opinion prepared by him for the Court of Appeal in *Serrano* v. *Priest* (Cal.App.) 89 Cal.Rptr. 345.

Respondents' petition for a rehearing was denied October 21, 1971, and the opinion was modified to read as printed above. McComb, J., was of the opinion that the petition should be granted.