[Civ. No. 22540. Second Dist., Div. Five. Apr. 12, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND F. McNAUGHT, Defendant and Appellant.

## COUNSEL

Robert G. Eckhoff, Public Defender and Lloyd R. Nocker, Deputy Public Defender, for Defendant and Appellant.

Patrick L. McMahon as Amicus Curiae on behalf of Defendant and Appellant.

David D. Minier, District Attorney, and Patrick J. McKinley, Deputy District Attorney, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant appeals from an order revoking probation (Pen. Code, § 1466, subd. 2(b)) and from a final judgment of conviction (Pen.

Code, § 1466, subd. 2(a)) of the Municipal Court of the Santa Barbara-Goleta Judicial District. The matters are before us on certification from the Appellate Department of the Santa Barbara County Superior Court and order of transfer by us. (Cal. Rules of Court, rule 62(a).)

## FACTS

On May 20, 1972, the Santa Barbara police found defendant drunk, staggering and "ready to fall" against the side of a liquor store. He was arrested for the offense generally known as "drunk in public." (Pen. Code, § 647, subd. (f).) According to a police report which is part of our record, this appears to have been his sixth arrest for that offense in about two months.

On May 23, 1972, defendant pleaded guilty to a complaint charging him with a violation of section 647, subdivision (f), of the Penal Code. He was sentenced to serve a term of six months in the county jail. Execution of the sentence was suspended and defendant was placed on summary probation for three months.

On June 19, 1972, defendant was found, again drunk, on the front lawn of a Santa Barbara residence. He was again arrested. On June 21, 1972, he pleaded guilty to a new section 647, subdivision (f), charge. He was again sentenced to serve six months in the county jail. With respect to the earlier charge, probation was revoked and the sentence was ordered executed, to be served concurrently with the sentence on the second charge.

## ISSUE

Defendant's claim with respect to each conviction is simply that he did not commit a public offense.

In order to understand defendant's point, it is necessary to examine not only section 647, subdivision (f), but also section 647, subdivision (ff), which was inserted into section 647 by the 1971 Legislature. Both are copied in the footnote.[1]

---

[1]"(f) Who is found in any public place under the influence of intoxicating liquor, any drug, toluene, any substance defined as a poison in Schedule D of Section 4160 of the Business and Professions Code, or any combination of any intoxicating liquor, drug, toluene, or any such poison, in such a condition that he is unable to exercise care for his own safety or the safety of others, or by reason of his being under the influence of intoxicating liquor, any drug, toluene, any substance defined as a poison in Schedule D of Section 4160 of the Business and Professions Code, or any combination of any intoxicating liquor, drug, toluene, or any such poison, interferes with or obstructs or prevents the free use of any street, sidewalk or other public way.

"(ff) When a person has violated subdivision (f) of this section, a peace officer,

Briefly summarized, the net effect of section 647, subdivisions (f) and (ff), is that in counties which operate the type of facility described in section 647, subdivision (ff), known generally as a detoxification center, persons guilty of "simple" violations[2] of section 647, subdivision (f), may —or perhaps must—be diverted out of the criminal process and treated as in need of therapy rather than punishment.

This is the outline of defendant's argument: The effect of section 647, subdivision (ff), is that in counties which operate detoxification centers simple violations of section 647, subdivision (f), are no longer crimes. Santa Barbara does not operate such a center. To treat him as a criminal for a condition which in counties having a detoxification center would cause him to become a patient, discriminates against him on the fortuitous basis that he was arrested in a county which does not operate such a center. His convictions, therefore, deny him equal protection.

In determining the validity of defendant's contention, we have had the benefit of several briefs by the parties, a thoughtful opinion of the appellate department and a most stimulating amicus curiae brief filed by Mr. Patrick L. McMahon of the Santa Barbara Bar.

## DISCUSSION

■ In view of the conclusion we have reached, we do not find it necessary to decide the correctness of defendant's premise that a simple violation of section 647, subdivision (f), does not constitute a crime in a

---

if he is reasonably able to do so, shall place the person, or cause him to be placed, in civil protective custody. Such person shall be taken to a facility, designated pursuant to Section 5170 of the Welfare and Institutions Code, for the 72-hour treatment and evaluation of inebriates. A peace officer may place a person in civil protective custody with that kind and degree of force which would be lawful were he effecting an arrest for a misdemeanor without a warrant. No person who has been placed in civil protective custody shall thereafter be subject to any criminal prosecution or juvenile court proceeding based on the facts giving rise to such placement. This subdivision shall not apply to the following persons:

"(1) Any person who is under the influence of any drug, or under the combined influence of intoxicating liquor and any drug.

"(2) Any person who a peace officer has probable cause to believe has committed any felony, or who has committed any misdemeanor in addition to subdivision (f) of this section.

"(3) Any person who a peace officer in good faith believes will attempt escape or will be unreasonably difficult for medical personnel to control."

[2]By referring, from time to time, to "simple" violations of section 647, subdivision (f), we mean to describe violations which do not involve any of the three numbered exceptions to section 647, subdivision (ff), namely violations involving a drug, those who appear to be accompanied by other crimes and those involving a violator who appears a poor escape risk or too hard to handle for medical personnel. The facts which led to defendant's two arrests concededly indicate that his were the simplest of simple violations.

county operating a detoxification center.[3] Since it is certain that in such a county defendant would at least have had a chance to be handled therapeutically rather than criminally, while in Santa Barbara he had none, his point really does not depend on the legal correctness of the premise. In any event, for the sake of simplicity we shall assume that in a county operating a detoxification center a simple violation of section 647, subdivision (f), may not be treated as a crime.

After we ordered these appeals transferred to us, Division One of the Court of Appeal of the First Appellate District filed its opinion in *People v. Superior Court (Colon)*, 29 Cal.App.3d 397 [105 Cal.Rptr. 695].

Whether or not *Colon* represents a square holding on the issue presented by these appeals is debatable. Colon was arrested for a violation of section 647, subdivision (f), in Monterey County which apparently had not established a detoxification center either. While he was being booked as a criminal, certain illegal drugs were found on his person. He sought suppression on the ground that section 647, subdivision (ff), prohibited the booking process. His argument hinged on the constitutionality of a prosecution for a violation of section 647, subdivision (f), in a county which had not established a detoxification center.

The Court of Appeal found that the trial court had erroneously ordered suppression. It first held that the 1971 insertion of section 647, subdivision (ff), did not invalidate prosecutions for violations of section 647, subdivision (f). Then, however, it weakened the relevance of its holding as far as our problem is concerned, by holding that even if Colon had been delivered to a detoxification center, precisely the same search could have been conducted "to make certain that the inebriate did not bring any alcohol into the facility . . ."

In view of the questionable nature of *Colon* as a holding on the only issue before us, we will consider it afresh.

In framing his equal protection argument defendant recognizes, as he must, that he cannot successfully invoke the equal protection clause simply by pointing to a lack of territorial uniformity. He would be fighting at least two United States Supreme Court decisions.

Even if *Salsburg* v. *Maryland*, 346 U.S. 545 [98 L.Ed. 281, 74 S.Ct.

---

[3]Reasonable men may well differ on that point. Without discussing it further, it is apparent that most of the difficulties are caused by the phrase "if he is reasonably able to do so," which qualifies the officer's duty to place the inebriate in civil protective custody. The problem is that section 647, subdivision (ff), does not specify what factors may be taken into consideration in determining the officer's reasonable ability to place the inebriate in civil protective custody.

280], the principal case relied on by the *Colon* court, is distinguishable as involving a matter of criminal procedure,[4] *McGowan* v. *Maryland*, 366 U.S. 420, 427 [6 L.Ed.2d 393, 399-400, 81 S.Ct. 1101] is not. In that case Maryland's statutes permitted the Sunday sale of certain merchandise in Anne Arundel County, while prohibiting it in others. Said the court: "Secondly, appellants contend that the statutory arrangement which permits only certain Anne Arundel County retailers to sell merchandise essential to, or customarily sold at, or incidental to, the operation of bathing beaches, amusement parks et cetera is contrary to the 'Equal Protection' Clause because it discriminates unreasonably against retailers in other Maryland counties. *But we have held that the Equal Protection Clause relates to equality between persons as such, rather than between areas and that territorial uniformity is not a constitutional prerequisite.* With particular reference to the State of Maryland, we have noted that the prescription of different substantive offenses in different counties is generally a matter for legislative discretion. We find no invidious discrimination here. See *Salsburg* v. *Maryland, supra.*" (*McGowan* v. *Maryland, supra,* 366 U.S. at p. 427 [6 L.Ed.2d at pp. 399-400]. Italics added.)

All the same, while *Salsburg* and *McGowan* undoubtedly stand for the proposition that a lack of territorial uniformity does not necessarily deny equal protection, they clearly do not hold that a state can classify and discriminate as it pleases, as long as it does so on a territorial basis.[5] (See generally, Horowitz & Neitring, *Equal Protection Aspects of Inequalities in Public Education and Public Assistance Programs from Place to Place Within a State* (1968) 15 U.C.L.A. L.Rev. 787.) If *Salsburg* and *McGowan* could be made to carry that much water, issues such as the one decided in *Whittaker* v. *Superior Court,* 68 Cal.2d 357 [66 Cal.Rptr. 710, 438 P.2d 358], would hardly merit discussion.[6]

---

[4]*Salsburg,* decided sometime before *Mapp* v. *Ohio,* 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], involved a Maryland law which, in effect, permitted illegally obtained evidence to be used in gambling prosecutions in just three counties. The court found no denial of equal protection. It said: "There seems to be no doubt that Maryland could validly grant home rule to each of its 23 counties and to the City of Baltimore to determine this rule of evidence by local option. [Fn. omitted.] It is equally clear, although less usual, that a state legislature may itself determine such an issue for each of its local subdivisions, having in mind the needs and desires of each. *Territorial uniformity is not a constitutional requisite. . . .*" (*Salsburg* v. *Maryland,* 346 U.S. at p. 552 [98 L.Ed. at p. 288]. Italics added.)

[5]Thus, in *Griffin* v. *School Board,* 377 U.S. 218, 230-232 [12 L.Ed.2d 256, 264-266, 84 S.Ct. 1226], the Supreme Court held that a Virginia statute closing certain public schools could not survive an attack on equal protection grounds because it discriminated against areas, rather than persons. The record showed that the schools of Prince Edward County were closed, as permitted by the statute, solely to insure racial segregation.

[6]*Whittaker* involved the question whether California denies equal protection by

Section 647, subdivision (ff), must be viewed in its legal and historical setting. It provides for a diversion of certain persons found to have been in violation of section 647, subdivision (f), to facilities "designated pursuant to Section 5170 of the Welfare and Institutions Code." Section 5170 appears in article 1.5, chapter 2, part 1, division 5 of the Welfare and Institutions Code. Article 1.5, which deals generally with the temporary detention of certain types of inebriates, not just persons found to be in violation of section 647, subdivision (f), was not enacted until 1969. (Stats. 1969, ch. 1472.) It was then sandwiched into the existing statutory framework which had been created by the California Mental Health Act of 1967 (Stats. 1967, ch. 1667, p. 4074 et seq.), consisting of the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) and the Short-Doyle Act (Welf. & Inst. Code, § 5600 et seq.). This is not the place to list all the various objectives of the 1967 legislation, but one of its express purposes was to create a more extensive network of community-based services for the mentally ill. (*Thorn* v. *Superior Court,* 1 Cal.3d 666, 668 [83 Cal.Rptr. 600, 464 P.2d 56].) In the main the Lanterman-Petris-Short Act describes the facilities to be furnished to the mentally ill, as well as certain procedures for voluntary and involuntary admissions, while the Short-Doyle Act provides for methods of financing the mental health services described in Lanterman-Petris-Short.[7] As now structured[8] it prescribes the establishment of community health services by the board of supervisors of every county (Welf. & Inst. Code, § 5602), declares the availability of state funds for mental health service provided under the county Short-Doyle plan (Welf. & Inst. Code, § 5603), establishes local advisory boards (Welf. & Inst. Code, § 5604), and prescribes certain standards of administration for local mental health services (Welf. & Inst. Code, § 5607 et seq.) The powers and duties of the local board are described in section 5606 as follows: "The local mental health advisory board shall:

"(a) Review and evaluate the community's mental health needs, services, facilities, and special problems.

"(b) Review the County Short-Doyle Plan.

affording persons convicted of misdemeanors in certain counties an appeal to a three-judge appellate department, while others convicted of identical misdemeanors in counties having no municipal court, have their appeals heard by a single judge.

[7]Section 5600 of the Welfare and Institutions Code, as enacted in 1967 provided, in part, as follows: ". . . This part is designed to encourage and to assist financially local governments in the establishment and development of mental health services, including services to the mentally retarded, through locally administered and locally controlled community mental health programs. . . ."

[8]Both Lanterman-Petris-Short and Short-Doyle have been frequently amended since 1967.

"(c) Advise and report directly to the governing body as to a program of community mental health services and facilities, submit an annual report to the governing body, and, when requested by such governing body may make recommendations regarding the appointment of a local director of mental health services.

"(d) After adoption of a program, continue to act in an advisory capacity to the governing body and to the local director of mental health services."

Short-Doyle further declares that each county is to adopt an annual plan subject to review by the Director of Mental Hygiene. (Welf. & Inst. Code, § 5650 et seq.) Finally it contains very specific provisions for state reimbursement to counties. (Welf. & Inst. Code, § 5700 et seq.) Generally speaking, the state pays 90 percent of the costs for approved county Short-Doyle plans (Welf. & Inst. Code, § 5705), plus certain additional funds for counties whose need for mental health service is disproportionately great compared to the assessed value of its taxable property. (Welf. & Inst. Code, § 5709.5.)

The net effect of the 1967 legislation is that the primary decision with respect to the mental health services furnished by a county lies with the county, subject to standards and regulations adopted by the state. If these are complied with, the lion's share of the cost rests on the state's shoulders.

It is into this statutory framework that the 1969 Legislature fitted article 1.5 relating to the evaluation and treatment of inebriates and the establishment of detoxification centers. There is nothing in the statute which compels a county to establish a detoxification center. Indeed section 5176, part of article 1.5, states expressly that the article "shall apply only to those counties wherein the board of supervisors has adopted a resolution stating that suitable facilities exist within the county for the care and treatment of inebriates . . . ." Short-Doyle funding for a center which the county chooses to establish is provided by section 5174.[9] No statute penalizes a county for not establishing or maintaining a center.

It is thus apparent that such centers as are available, are established as part of the county Short-Doyle plan. It was obviously the intent of the

---

[9]There is some reference in the parties' submissions to the provision of section 5174 to the effect that priority funding is not available for detoxification centers. This apparently refers to a certain schedule of priorities set forth in section 5704 of the Welfare and Institutions Code as it read before it was repealed by the 1971 Legislature. (Stats. 1971, ch. 1609.) The present language of section 5704 seems to make that portion of section 5174 which denied priority funding to detoxification centers meaningless.

Legislature that the existence of such a center should not be forced on counties, but that it should be up to the responsible local authorities to determine whether local conditions call for its establishment and maintenance. The local factors which the local advisory board and the board of supervisors may legitimately take into consideration in deciding whether to operate a center are so diverse, that they defy enumeration. Some which occur to us as being relevant are listed in the footnote.[10]

Viewed in this statutory setting it is apparent that there is nothing arbitrary about the criteria for the establishment of facilities by means of which certain violators of section 647, subdivision (f), may be diverted out of the criminal process into a therapeutic setting. By consistent state policy their availability depends on the judgment of local authorities who, presumably, are most familiar with local conditions.[11]

---

[10]1. *Geographic Factors:* (Size of county in area and population; population distribution by towns versus country; number of locations needed).

2. *Demographic Factors:* (Stability of size of population; median age, etc.).

3. *Socioeconomic Factors:* (Median income; drinking habits (public vs. private); incidence of unemployment and other stress-producing conditions: problems peculiar to particular ethnic minorities).

4. *Financial Factors:* (Impact of problem drinking on other county services and facilities (hospitals, law enforcement, courts, jail, welfare agencies)).

5. *Law Enforcement Factors:* (Specific impact of problem drinking on crime as a causative or related factor; types of crimes (violent or victimless); projections for future.)

6. *Health Factors:* (Specific impact of problem drinking or physical and mental health problems as a causative or related factor; projections for future).

7. *Existing Public and Private Services for Problem Drinkers:* (Hospitals, clinics, A.A.).

8. *Results of Present Handling of Problem of Inebriation In Criminal Context.* (Police efficiency and humaneness; sentencing habits of local judiciary; recidivism, etc.).

9. *Projected Results From Detoxification Center:* (Expert opinions, interpretation of data from similar projects).

10. *Availability of Resources to Establish and Operate:* (A. Cost, staffing, community support. B. Backup services. C. Follow-up services).

Compare the elements of a county Short-Doyle plan. (Welf. & Inst. Code, § 5651.)

[11]Equal protection aside, neither side questions the power of the Legislature to permit counties to change the criminal aspects of simple violations of section 647, subdivision (f), by appropriate diversion procedures. While it is true that the Legislature has "adopted a general scheme for the regulation of the criminal aspects of being intoxicated in a public place" (*In re Koehne,* 59 Cal.2d 646, 648 [30 Cal.Rptr. 809, 381 P.2d 633]), obviously section 647, subdivision (ff), is a partial, conditional withdrawal from the field. This clearly permits counties to legislate in the area in a manner "not in conflict with general laws." (Cal. Const., art. XI, § 7; see *Watson* v. *County of Merced,* 274 Cal.App.2d 263, 265 [78 Cal.Rptr. 807]; *Stewart* v. *County of San Mateo,* 246 Cal.App.2d 273, 282-283 [54 Cal.Rptr. 599]; *Ratkovich* v. *City of San Bruno,* 245 Cal.App.2d 870, 877 [54 Cal.Rptr. 333]; Montgomery, *State Pre-Emption and Local Legislation,* 4 Santa Clara Law., p. 188, fn. 2.)

Indeed defendant does not really question these criteria. Instead he ignores them and simply submits that he is being denied equal protection because the existence of a detoxification center depends on the financial ability of the county to pay for its establishment and maintenance. His argument, of course, refers us to the principle that classifications based on wealth are suspect and the application of that principle to classifications based on the wealth of public entities in *Serrano* v. *Priest,* 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].

We realize that in view of the United States Supreme Court's decision in *San Antonio Independent School District* v. *Rodriguez* (March 21, 1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278] the continuing validity of *Serrano* in California is an issue of great delicacy. Suffice it to say, that whatever may be the future of the *Serrano* principle or principles in this state, on the record before us defendant has completely failed to make even a colorable threshold case of being deprived of the opportunity for treatment in a detoxification center by reason of Santa Barbara County's lack of wealth. As far as we know Santa Barbara County does not have a detoxification center for the precise reasons which, under the statutory scheme, may move the county authorities to decide not to operate one. (See fn. 10, *supra.*)[12] While, as citizens we might wish that the diversion provisions of section 647, subdivision (ff), should apply on a state-wide basis, we cannot hold that their present, limited application, violates the equal protection clause. We must therefore decline defendant's implied invitation that somehow we use this appeal as a lever to force the Santa Barbara County Board of Supervisors to adopt what other counties may believe to be a more enlightened attitude toward the problem of public inebriation. In the framework of this case, the problem is political not legal.

The very fact that we may be in basic sympathy with the progressive intent of section 647, subdivision (ff), compels us to look critically at a claim that it denies equal protection to those whom it does not benefit. *McDonald* v. *Board of Election,* 394 U.S. 802 [22 L.Ed.2d 739, 89 S.Ct. 1404], involved an Illinois statute which enabled certain classes of eligible

---

[12]Of course an arguable case can be made out that, all other things being equal, a county with money to burn will find it easier to make the policy decision to operate a detoxification center than one which staggers from one fiscal crisis to the next. It is by no means certain, however, that the mere existence of a detoxification center gives the public inebriate a better chance for therapeutic handling. A county brimming with fiscal health also has money for more law enforcement personnel and hardware, deputy prosecutors and jails. In any wealthy organization, the only factor inhibiting growth is lack of imagination. Having in mind the several judgmental factors built into section 647, subdivision (ff), who can really predict where the public inebriate in a wealthy county will find himself the morning after?

voters to vote by absentee ballot. The statute was attacked on equal protection grounds by inmates of the Cook County jail, who were awaiting trial on nonbailable offenses, or could not afford to make bail. They were not covered by the statute. In refusing relief, the court observed: "Ironically, it is Illinois' willingness to go further than many States [fn. omitted] in extending the absentee voting privileges . . . that has provided appellants with a basis for arguing that the provisions operate in an invidiously discriminatory fashion to deny them a more convenient method of exercising the franchise. Indeed, appellants' challenge seems to disclose not an arbitrary scheme or plan but, rather, the very opposite—a consistent and laudable state policy of adding, over a 50-year period, groups to the absentee coverage as their existence comes to the attention of the legislature. That Illinois has not gone still further, as perhaps it might, should not render void its remedial legislation, which need not, as we have stated before, 'strike at all evils at the same time.' *Semler* v. *Dental Examiners,* 294 U.S. 608, 610 (1935)." (*McDonald* v. *Board of Election, supra,* 394 U.S. at pp. 810-811 [22 L.Ed.2d at pp. 746-747].)

It might be tragic if section 647, subdivision (ff), had the effect contended for by defendant. While a decision in his favor would not invalidate the section, the result would necessarily be that simple section 647, subdivision (f), arrestees in counties like Santa Barbara must be released. It is anybody's guess how the Legislature would react to such a holding. The possibility that the net result would simply be a repeal of section 647, subdivision (ff), cannot be overlooked.

Finally, defendant's arguments, as well as the amicus curiae brief, refer us briefly to the several provisions in the state Constitution "which embody the principle of equality before the law" (*Whittaker* v. *Superior Court, supra,* 68 Cal.2d 357, 367) and "provide generally equivalent but independent protections" (*Dept. of Mental Hygiene* v. *Kirchner,* 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361]) as the equal protection clause of the Fourteenth Amendment. These are, of course, sections 11 and 21 of article I and section 16 of article IV.

While California is free to interpret its own Constitution to prohibit legislation which the equal protection clause allows, no argument is made that this should be the case here. The only significant California decision to which we are referred is *People* v. *Lewis,* 13 Cal.2d 280, 282 [89 P.2d 388], where the Supreme Court assumed, as a matter of course, that the then section 19a of the Penal Code which limited confinement for misdemeanors to one year in jail, except in counties which operated a penal farm,

was unconstitutional.[13] Surely it does not require extended discussion to point up the difference between a statute which makes the maximum length of punitive confinement depend on the type of correctional facility maintained by the county, and section 647, subdivision (ff), which seeks to divert persons guilty of a particular victimless crime out of the criminal process, provided that the county has the facilities to furnish a more enlightened treatment than punishment.

In case number D-25965 in the Municipal Court of the Santa Barbara-Goleta Judicial District the order revoking probation and ordering the sentence into execution is affirmed.

In case number D-26101 in the same court, the judgment of conviction is affirmed.

Stephens, J., and Cole, J.,* concurred.

A petition for a rehearing was denied April 27, 1973, and appellant's petition for a hearing by the Supreme Court was denied June 7, 1973.

---

[13]The statute under which the defendant in *Lewis* was convicted carried a maximum punishment of two years.

*Assigned by the Chairman of the Judicial Council.