OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

| | | |
|---|---|---|
| OPINION | : | No. 89-605 |
| of | : | |
| | : | APRIL 4, 1990 |
| JOHN K. VAN DE KAMP | : | |
| Attorney General | : | |
| | : | |
| ANTHONY S. DA VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE ROSS JOHNSON, MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following question:

May a joint union high school district establish and operate a junior high school program for one of its component elementary districts for the exclusive attendance by the student residents of that district?

CONCLUSION

A joint union high school district may establish and operate a junior high school program for one of its component elementary districts for the exclusive attendance by the student residents of that district.

ANALYSIS

We are advised that a joint union high school district[1] is comprised of a number of elementary districts conducting kindergarten through eighth grade programs. The question is whether the high school district may establish and operate a junior high school program, consisting of the seventh and eighth grades, for only one of its component districts, from which the student residents of other component districts would be excluded.

Section 37060 of the Education Code[2] provides simply that the governing board of a high school district, including a joint union high school district, "may establish a junior high school or a system of junior high schools." The quest for authority to establish a junior high school

---

[1]A joint union high school district is comprised of two or more elementary districts situated wholly or in part in different counties. (Ed. Code, §§ 82, 86.)

[2]Hereinafter, all unidentified section references are to the Education Code.

1. 89-605

for only one component district appropriately begins with article IX, section 14, of the California Constitution:

> "The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts.

> "The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established."

Prior to the addition of the second sentence at the general election on November 7, 1972, operative July 1, 1973, the courts had taken a narrow view of the powers of a school district, namely, that a school district had only those powers that were conferred by a specific statutory grant. (*Grasko* v. *Los Angeles City Bd. of Educ.* (1973) 31 Cal.App.3d 290, 301; *Elder* v. *Anderson* (1962) 205 Cal.App.2d 326, 333; 65 Ops.Cal.Atty.Gen. 326, 327 (1982); 63 Ops.Cal.Atty.Gen. 851, 852 (1980).)

> Pursuant to the constitutional grant of authority, the Legislature enacted section 35160:

> "On and after January 1, 1976, the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established."

By section 199 of the same enactment which added section 37060 in its present form (Stats. 1987, ch. 1452, § 227.5), section 35160.1 was added to clarify the meaning of section 35160:

> "(a) The Legislature finds and declares that school districts, county boards of education, and county superintendents of schools have diverse needs unique to their individual communities and programs. Moreover, in addressing their needs, common as well as unique, school districts, county boards of education, and county superintendents of schools should have the flexibility to create their own unique solutions.

> "(b) In enacting Section 35160, it is the intent of the Legislature to give school districts, county boards of education, and county superintendents of schools broad authority to carry on activities and programs, including the expenditure of funds for programs and activities which, in the determination of the governing board of the school district, the county board of education, or the county superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 35160 be liberally construed to effect this objective.

> "(c) The Legislature further declares that the adoption of this section is a clarification of existing law under Section 35160."

Further, section 1 (uncodified) of the 1987 legislation further expresses the legislative intent:

"The Legislature finds and declares that, in 1972, the people of the state adopted an amendment to Section 14 of Article IX of the California Constitution, which permits the Legislature to authorize the governing boards of school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established.

". . . . . . . . . . . . . . . . . . . . . . . . . . . ."

These provisions effectively render the strict rule inapplicable (63 Ops.Cal.Atty.Gen., *supra*, 852; 60 Ops.Cal.Atty.Gen. 177, 180 (1977)) and "profoundly alters the analytic focus of a determination of a school district's authority in any given case. In essence, we now must look to whether particular conduct is precluded, where previously we searched for express or implied authorization for such conduct." (60 Ops.Cal.Atty.Gen. 206, 208 (1977).)

However, we have previously determined, based upon an examination of the Detailed Analysis by the Legislative Counsel in the voters' pamphlet (Proposition 5) at the general election on November 7, 1972, that the broad powers contemplated by the constitutional amendment are limited to those which are "related to school purposes" (64 Ops.Cal.Atty.Gen. 146, 147-148; and cf. 60 Ops.Cal.Atty.Gen., *supra*, 208), i.e., which are directed toward educational needs (60 Ops.Cal.Atty.Gen., *supra*, 180-181). It has been determined, for example, that the "permissive" standard does not allow any latitude in terms of compliance with the bidding procedures set forth in Public Contract Code section 20111. (*Associated General Contractors* v. *San Francisco Unif. Sch. Dist.* (9 CA 1980) 616 F.2d 1381, 1384-1385; and see 71 Ops.Cal.Atty.Gen. 266 (1988) -- delegation to private entity of procurement authority.) Nevertheless, we are neither asked to evaluate nor are we presented with the basis for the proposed action which we shall assume, for purposes of this discussion, to be directed toward a rationally perceived educational advantage.

Accordingly, we need determine only whether particular conduct is statutorily precluded. (71 Ops.Cal.Atty.Gen., *supra,* 269.) Section 37060, providing that the governing board of a high school district "may establish a junior high school or a system of junior high schools," contains no universal prerequisite or inherent limitation. Consequently, the establishment of a junior high school for one of its elementary districts is not statutorily precluded.

Further, another section, 37085, provides that any school district within a junior high school or system of junior high schools maintained by a high school district, may withdraw from the junior high system upon the majority vote of the qualified electors of the high school district. (Cf. *San Dieguito Union High School District* v. *Rosander* (1985) 171 Cal.App.3d 968.) While that section concerns the withdrawal of a component district, it nevertheless clearly contemplates the existence of a junior high school program for less than all of the component districts. We perceive no basis for requiring the establishment and subsequent withdrawal from the system as the sole means of accomplishing that result.

It may be suggested that the operation of a junior high program for less than all component districts would create a classification between those residents of the high school district who are entitled to attend and those who are not, which would violate the equal protection clause of the Fourteenth Amendment to the United States Constitution, and of article I, section 7 of the California Constitution. With respect to such classifications, there are two standards of review. As to classifications which are "suspect" in constitutional terms (e.g., sex -- *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 18; wealth -- *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597; alienage -- *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288, 291-294), or which touch upon a fundamental interest "explicitly or implicitly guaranteed by the Constitution" (*D'Amico* v. *Board of Medical*

*Examiners* (1974) 11 Cal.3d 1, 18; e.g., privacy -- *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130; voting -- *County of Riverside* v. *Whitlock* (1972) 22 Cal.3d 863, 871-872; education -- *Serrano* v. *Priest, supra*, at 604-610; holding public office -- *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 720-721), strict scrutiny is required and the state bears the burden of establishing that it has a "compelling interest" which justifies the classification and that such classification is necessary to further that purpose or interest. (*D'Amico* v. *Board of Medical Examiners, supra*, at 17; 68 Ops.Cal.Atty.Gen. 101, 104 (1985).) The conventional standard, on the other hand, requires only that differential treatment have some "reasonable basis" or bear "some rational relationship to a conceivable legitimate state purpose." (*Schwalbe* v. *Jones* (1976) 16 Cal.3d 514, 517-518; 69 Ops.Cal.Atty.Gen. 191, 198 (1986).)

Education is a fundamental interest. (*Serrano* v. *Priest, supra*, 5 Cal.3d at 609.) The classification in question is between those who are permitted to attend a certain junior high school and those who are not. Does that distinction touch upon anyone's fundamental interest in education? We are presented for purposes of this opinion with no facts which would suggest that the distinction is based on any factor other than the <u>place</u> at which the seventh and eighth grades will be taught, and the school district responsible for teaching them. Nowhere in the court's extended discourse on the importance of education in a modern society did it allude to any fundamental interest or significance in the location where it might be attained, or the direction of travel required to arrive there. Rather, *Serrano* concerned a classification which directly impacted the <u>quality</u> of education. No such qualitative differential is inherent in the distinctions as to place or school district. Of course, the educational system of every state in the nation is based on such distinctions, which are essential to the conduct of an orderly process of education.

Nor did the court hold, in any event, that every classification "touching" on education is constitutionally suspect without regard to any attendant involvement of a suspect class. The suspect classification was identified as one drawn on the basis of wealth or property. The interrelationship between affluence and the quality of education which provided the major premise of the *Serrano* opinion, is seen in the following excerpts:

"We are called upon to determine whether the California public school financing system, with its substantial dependence on local property taxes and resultant wide disparities in school revenue, violates the equal protection clause of the Fourteenth Amendment. We have determined that this funding scheme invidiously discriminates against the poor because it makes the quality of a child's education a function of the wealth of his parents and neighbors. Recognizing as we must that *the right to an education in our public schools is a fundamental interest which cannot be conditioned on wealth*, we can discern no compelling state purpose necessitating the present method of financing." (*Id.* at 589; emphasis added.)

"But plaintiffs' equal protection attack on the fiscal system has an additional dimension. They assert that the system not only draws lines on the basis of wealth but that it `touches upon,' indeed has a direct and significant impact upon, a `fundamental interest,' namely education. It is urged that these two grounds, *particularly in combination*, establish a demonstrable denial of equal protection of the laws. . . . Plaintiffs' contention--that education is a fundamental interest *which may not be conditioned on wealth*--is not supported by any direct authority." (*Id.* at 604; emphasis added.)

"We, therefore, arrive at these conclusions. The California public school financing system, as presented to us by plaintiffs' complaint supplemented by matters judicially noticed, since it deals intimately with education, obviously touches upon

a fundamental interest. For the reasons we have explained in detail, this system conditions the full entitlement to such interest on wealth, classifies its recipients on the basis of their collective affluence and *makes the quality of a child's education depend upon the resources of his school district* and ultimately upon the pocketbook of his parents. We find that such financing system as presently constituted is not necessary to the attainment of any compelling state interest." (*Id.* at 614; emphasis added.)

It is assumed, for the purposes of this analysis, that we are concerned neither with any issue respecting a disparity of educational quality or opportunity nor with any ulterior invidious discriminatory effect.[3] Rather, the question presented is purely one of governmental organization based, presumably, upon factors such as geographical area, population, effectiveness of the elementary district, or other relevant considerations such as the conduct of a pilot program for experimental purposes on a limited basis. Accordingly, it is necessary only that the basis for the classification be rationally related to a legitimate governmental objective. (*Schwalbe* v. *Jones, supra,* 16 Cal.3d at 517.)

In any event, the courts have not favored claims of discrimination which are territorially based. (*People* v. *McNaught, supra,* 31 Cal.App.3d at 603.) In *McGlothlen* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1021, the court reviewed the state's alcoholic rehabilitation program, in lieu of license revocation, which was territorially limited to four counties:

"Territorial uniformity is not a constitutional requisite under the equal protection clause of the Fourteenth Amendment. (*McGowan* v. *Maryland* (1961) 366 U.S. 420, 427; and *Salsburg* v. *Maryland* (1954) 346 U.S. 545, 550-552.) Nor is it absolutely required by the provisions of the California Constitution. (*Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357, 367-368, 370-372; *People* v. *McNaught, supra,* 31 Cal.App.3d 599, 603-604; and *People* v. *Superior Court (Colon), supra,* 29 Cal.App.3d 397, 400-401.) The test in *Whittaker* appears applicable here. There the court stated: `Legislative classification as to treatment and procedure within a state judicial system according to factors such as geographical area, population, or other relevant considerations, does not deny equal protection of the laws unless such classification is shown to be palpably arbitrary and without a sound basis in reason.' (68 Cal.2d at p. 370.)"

As stated in *Salsburg* v. *Maryland* (1954) 346 U.S. 545, 551, "[t]he Equal Protection Clause relates to equality between persons as such rather than between areas." If, indeed, one high school district may establish a junior high program for all of the students within its boundaries, and an adjoining district may decline to provide any such program within its territory, no solid reason would appear why there may not be such diversities in different parts of the same district. (See *Salsburg* v. *Maryland, supra,* at 551 n. 6.) In either case, territorial uniformity is not a constitutional prerequisite. (*Id.* at 552.) As stated in *Metropolis Theatre Co.* v. *Chicago* (1913) 228 U.S. 61, 69-70:

---

[3]If, on the other hand, the establishment of a junior high school program results in a significant qualitative differential between those who are included and those who are excluded, or creates a cognizable ethnic variance, the compelling interest test would apply. (Cf., *Griffin* v. *School Board* (1964) 377 U.S. 218, 230-232; *People* v. *McNaught* (1973) 31 Cal.App.3d 599, 604.)

"The problems of government are practical ones and may justify, if they do not require, rough accommodations--illogical, it may be, and unscientific. But even such criticism should not be hastily expressed. What is best is not always discernible; the wisdom of any choice may be disputed or condemned. Mere errors of government are not subject to our judicial review. It is only its palpably arbitrary exercises which can be declared void under the Fourteenth Amendment; and such judgment cannot be pronounced of the ordinance in controversy."

(See also *Salsburg* v. *Maryland, supra*, 346 U.S. at 550.)

Similarly, we are unable to declare that no rational basis can be conceived for the establishment of a territorially limited program. It is concluded that a joint union high school district may establish and operate a junior high school program for one of its component elementary districts, from which the student residents of other component districts would be excluded.

\* \* \* \* \*